[Crim. No. 323.   Third Appellate District.—December 28, 1915.]

## THE PEOPLE, Respondent, v. LIM FOON, Appellant.

CRIMINAL LAW—CIRCUMSTANTIAL EVIDENCE—INSTRUCTION.—An instruction that "there is nothing in the nature of circumstantial evidence that renders it any less reliable than other classes of evidence," and that "a man may as well swear falsely to an absolute knowledge of the facts as to a number of facts, if true, the fact on which the guilt or innocence depends must follow," while lacking in clearness of expression and not strictly grammatical, is not misleading.

ID.—DYING DECLARATION—DISREGARD BY JURY—INSTRUCTION PROPERLY REFUSED.—An instruction in which it was declared that dying declarations should be received with caution, and that unless it appeared that the declaration made by the deceased just prior to his death accusing the defendant of having fired the fatal shots was made "under a clear opinion of impending death, you cannot consider such declaration as evidence in this case, and the court cautions you . . . not to give as much weight to such evidence as if the same statement had been testified to in health and subject to cross-examination," is properly refused, where the jury was instructed to receive with caution the evidence of the dying declaration "for the reason that the declarant had not been administered an oath, and an opportunity for cross-examination has not been afforded the defendant and that the declarant might be influenced against the defendant," and for the further reason that the physical condition of the deceased when making the statement might have been such as to render questionable the reliability of his declaration.

ID.—IDENTITY OF MURDERER—CONFLICT OF PROOF—DUTY TO ACQUIT DEFENDANT—INSTRUCTION PROPERLY REFUSED.—An instruction in a prosecution for murder that if the jury believed from the evidence that the person who fired the fatal shots was a man taller and heavier than the defendant, it was their duty to acquit the defendant, "notwithstanding that certain witness or witnesses may testify that the person who fired such shots was said defendant, nevertheless, there would exist such a conflict as to the identity of the person who fired such shots as to raise a reasonable doubt as to whether or not it was the defendant," is properly refused.

ID.—ACQUITTAL OF DEFENDANT—REASONABLE DOUBT OF GUILT BY SINGLE JUROR—INSTRUCTION PROPERLY REFUSED.—An instruction advising the jury that if after considering all the evidence "a single juror has a reasonable doubt of the defendant's guilt, arising out of any part of the evidence, then they cannot convict him," is properly disallowed, where the court instructed all the jurors that if they entertained a reasonable doubt of the defendant's guilt or "upon a single fact or element necessary to constitute the crime, it is your

duty to give the defendant the benefit of such doubt and acquit him."

ID.—CREDIBILITY OF DYING DECLARATION—BELIEF IN HEREAFTER—INSTRUCTION PROPERLY REFUSED.—An instruction that if the jury believed that the deceased "had no fear of God" and "had no conception of life after death wherein he would receive punishment for failure to tell the truth," then his alleged dying declaration should be disregarded "for the reason that there was no compelling cause to tell the truth in the hour of his impending death," is properly refused, in the absence of any evidence addressed to such matter other than the implication that the defendant might have been an adherent of a heathenish religion from the fact that he was a Chinaman.

ID.—MAKING OF DYING DECLARATION—DESIRE TO WREAK VENGEANCE—INSTRUCTION PROPERLY REFUSED.—An instruction that if the jury found that the deceased was actuated in making his alleged dying declaration "by the desire to wreak vengeance upon some person whom he might believe was a member of a society or a relative of a member of such society which was an enemy of a society to which the deceased belonged," it would then be their duty wholly to disregard such declaration, is properly refused, in the absence of any evidence justifying such implication.

ID.—DYING DECLARATION—EVIDENCE.—A dying declaration is admissible when it is made to appear that the declaration was made by a dying person under a sense of impending death, and that such declaration related to the cause of his death.

ID.—EVIDENCE—FLIGHT OF DEFENDANT — CROSS-EXAMINATION OF WITNESS—LIMITATION NOT ERRONEOUS.—Where a witness to the homicide is subjected to an extended cross-examination as to the direction in which the defendant ran immediately following the shooting, it is not prejudicial error to restrict the further examination of the witness as to how near he was to the defendant when the latter passed him.

ID.—EXAMINATION OF WITNESSES—DUTY OF COURT.—Where it is evident to the trial court, after a full and exhaustive examination of a witness upon a subject concerning which particular information is desired, that nothing more can be accomplished by continuing the inquiry, it is the duty of the court to put an end to such examination.

ID.—NEW TRIAL—IMPEACHING EVIDENCE.—It is not an abuse of discretion to refuse a new trial in such a prosecution upon the ground of newly discovered evidence, where it is apparent from the affidavits in support of the motion that the only purpose which the evidence referred to therein could accomplish would be the impeachment of two witnesses who testified for the prosecution and whose testi-

mony was itself wholly in impeachment of the testimony of the defendant and his witnesses upon the question of the *alibi* sought to be shown by the accused.

APPEAL from a judgment of the Superior Court of San Joaquin County, and from an order denying a new trial. J. A. Plummer, Judge.

The facts are stated in the opinion of the court.

Stephen N. Blewett, and George F. McNoble, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant was convicted in the superior court of San Joaquin County of the crime of murder of the first degree, the jury fixing the penalty at imprisonment for life.    (Pen. Code, sec. 190.)

This appeal is prosecuted by the defendant from the judgment and the order denying him a new trial.

The homicide occurred in the Chinese quarters of the city of Stockton, on the seventh day of March, 1915, and the party killed was an aged Chinese by the name of Yip Suey.

There is testimony showing that the shooting resulting in the killing of Yip Suey took place a short time after the noon hour of the day mentioned; that it was witnessed by several white men and a number of Chinese; that two Chinamen, the defendant and another, the latter not having been captured, simultaneously shot into the body of the deceased, one of the Chinamen so shooting being approximately on the right and the other likewise on the left side of their victim; that, after the shooting, both the Chinese engaged in the shooting ran from the scene thereof, the defendant going in a southerly direction and throwing the pistol with which he did the shooting on the sidewalk or street as he ran, and the other going rapidly in the opposite direction; that the defendant was pursued and ran into a building into which he was followed by some citizens and was finally apprehended near a chickenhouse in the rear of the building into which he fled and which was occupied by Chinese; that, when arrested, he was freely perspiring and bore the appearance of being nervous; that, shortly thereafter, the assistant district attorney brought the

defendant into the presence of Yip Suey and asked the latter if he knew the Chinaman so brought before him and Yip Suey, who had previously stated that he expected to die from his wounds, declared, pointing at said Chinaman, ''Yes, him man shoot me''; that Yip Suey shortly thereafter expired from the effects of his wounds; that an autoptical examination disclosed that into his body six shots had been fired, and that at least two of the wounds so produced were necessarily mortal.

The defendant at the trial claimed that he had nothing to do with the shooting, was not present at the scene of the homicide when it occurred, and, therefore, sought to establish an *alibi.*

It is not claimed on these appeals that the verdict is not sufficiently supported by the evidence, but it is contended that alleged errors in the rulings upon the evidence and in the action of the court in giving and in refusing to give certain instructions so seriously militated against the substantial rights of the accused at the trial as to compel a reversal of the judgment and the order. It is further insisted that the court should have granted a new trial on the ground of newly discovered evidence, and that its refusal so to consider and determine the effect of the showing made in that particular constituted an abuse of its discretion and, therefore, prejudicial error.

The assignments involving attacks upon the action of the court with respect to certain instructions are numerous, and some of them merit and will receive special notice.

1. The first point under this head is directed against an instruction in which the trial court described to the jury the two classes of evidence—direct and circumstantial—which are permissible in courts of justice for the proof of a disputed fact, and upon either of which, in a criminal case, a verdict of conviction may be predicated, if it measures up to the requirement of the rule in that class of cases that guilt must be established to a moral certainty and beyond a reasonable doubt. The particular part of said instruction to which the strictures of the defendant are confined is as follows: ''There is nothing in the nature of circumstantial evidence that renders it any less reliable than other classes of evidence; a man may as well swear falsely to an absolute knowledge of the facts as to a number of facts, if true, the fact on

29 Cal. App.—18

which the guilt or innocence depends must follow.'' In the same instruction, the court explained to the jury with clearness that in any case, whether the proof relied upon to establish guilt was direct or merely circumstantial, a conviction could not be justified unless such proof was such as to establish the fact of guilt beyond a reasonable doubt.

Instructions explaining to juries in criminal cases the distinction between direct and circumstantial evidence have often been given in substantially the same language as the one challenged here and have as often been approved by reviewing courts. (*People* v. *Morrow,* 60 Cal. 142, 144; *People* v. *Wilder,* 134 Cal. 182, 184, [66 Pac. 228]; *People* v. *Simmons,* 7 Cal. App. 559, 565, 566, [95 Pac. 48].) And such an instruction may with propriety be given in all appropriate cases, for there is a distinction between those two classes of evidence—an inherent distinction which is expressly recognized and explained by our laws (secs. 1828, 1831, and 1832, Code Civ. Proc.)—which should be explained to juries with the further explanation that the degree of proof essential to a conviction is in no sense or measure influenced by such distinction. The common notion with respect to the proofs in criminal cases is that a *stronger* case should be made before a conviction is justified where, for a conviction, sole reliance is placed upon evidence of purely a circumstantial character. This is, of course, an erroneous notion, the true rule being that the degree of proof necessary to a conviction is precisely the same whether the proof relied upon for a conviction be direct or circumstantial. In other words, whatever may be the character of the evidence, whether it be the direct testimony of an eye-witness to the fact in dispute or evidence of circumstances from which the existence of the fact in dispute may be inferred, it being relevant and competent, a conviction will be justified and sustained if the guilt of the accused is shown to a moral certainty and beyond a reasonable doubt, and, as stated, it is with eminent propriety that the jury should be enlightened upon these important matters.

While the language above quoted from the instruction in question here, as it appears in the record, is lacking in that clearness of expression which should always characterize instructions to juries, and, indeed, is not strictly grammatical, because of the omission to have inserted in the part quoted

above the words, "from which," immediately following the phrase, "as to a number of facts," still, taken as a whole, the instruction appears to be sufficiently clear in the expression of its true meaning as not to have had the effect of misleading the jury with respect to the proposition which it was the purpose and intention to explain by it.

2. The following instruction was proposed by the defendant, but disallowed by the court: " . . . If you believe from the evidence in this case that the person who fired the shots which caused the death of Yip Suey was a man taller and heavier than this defendant, notwithstanding that certain witness or witnesses may testify that the person who fired such shots was said defendant, nevertheless, there would exist such a conflict as to the identity of the person who fired such shots as to raise a reasonable doubt as to whether or not it was the defendant, then it is your duty to acquit this defendant."

The instruction was properly refused. Paraphrased, and thus reduced to its actual meaning, it merely states to the jury the very obvious proposition that if they should believe from the evidence that some other person than the defendant shot and killed Yip Suey, the accused would be entitled to an acquittal, and, of course, in that case he would be, and his acquittal obviously the result of a total failure to establish guilt beyond a reasonable doubt or at all and necessarily the complete repudiation of contrary proof, and not upon the proposition that a reasonable doubt existed by reason of a conflict between the evidence convincing them that some other person did the shooting and the testimony involving an expression of the opinion of certain witnesses that the defendant was the guilty party. Perhaps, however, the real purpose of the instruction was to state that a conflict as to the defendant's guilt arose in the evidence by reason of the positive statements of certain witnesses that a man not fitting his description did the shooting, and testimony showing the expression of the belief by other witnesses who claimed to have seen the trouble that the defendant was one of the men who shot the deceased, and that the conflict so arising in the proofs was sufficient to create a reasonable doubt of the defendant's guilt. But, assuming that to have been the proposition so sought to be stated, the instruction would still be vulnerable and wholly improper, since clearly it would involve a

trespass upon the province of the jury, with whom alone rests the right or the power to determine for themselves whether there exists under the evidence reasonable doubt of the defendant's guilt. .

3. The instruction requested by the defendant but rejected by the court, upon the question of the *alibi* interposed by the defendant, was fully covered by an instruction which constituted a part of the court's general charge. Instructions upon particular propositions are not required to be repeated, and for this reason the court was justified in disallowing the instruction in question.

4. The defendant proposed an instruction which would have told the jury that if, after considering all the evidence, "a single juror has a reasonable doubt of the defendant's guilt, arising out of any part of the evidence, then they cannot convict him." The court rejected said instruction, .and 'it is here claimed that it was prejudicial error to do so. The court properly disallowed the instruction upon the ground, as assigned by it, that the proposition therein stated was covered by the charge. The charge was, of course, addressed to all the jurors, and therein it was declared that if the jury entertained a reasonable doubt of the defendant's guilt or "upon a single fact or element necessary to constitute the crime, it is your duty to give the defendant the benefit of such doubt and acquit him." We must assume that from that language the jury must have understood that if, after a consideration of the evidence, any one of them entertained a reasonable doubt of the defendant's guilt or upon any element or fact the proof of which was essential to a conviction, it would be his duty not to agree to a verdict of guilty, and to adhere to his conviction so long as he remained in that state of mind. We are not authorized to assume that a juror who entertains a reasonable doubt of the guilt of a person charged with a criminal offense will yield his views merely because a majority of the jurors or all but himself have agreed upon the guilt of the accused. Such an assumption would involve an imputation against the intelligence of the average person competent under the law to serve in that important capacity which is not warranted, and such would necessarily be the assumption if we were required to hold that the jurors in this case did not understand from the court's general charge that a concurrence of all was requisite

to reach a verdict, and that none was required or, indeed, justified, in concurring in a verdict of guilty if he entertained a reasonable doubt of the defendant's guilt under the evidence.

5. The defendant requested the court to submit to the jury an instruction in which it was declared that dying declarations should be received with caution, and that, unless it appeared that the declaration made by the deceased just prior to his death accusing the defendant of having fired the fatal shots, and which declaration was admitted in evidence, was made "under a clear opinion of impending death, you cannot consider such declaration as evidence in this case; and the court cautions you . . . not to give as much weight to such evidence as if the same statement had been testified to in health and subject to cross-examination." The instruction further stated that if the jury believed that the deceased "had no fear of God" and "had no conception of life after death wherein he would receive punishment for failure to tell the truth," then his alleged dying declaration should be disregarded, "for the reason that there was no compelling cause to tell the truth in the hour of his impending death." The court refused to adopt the instruction on the ground that there was "no evidence upon which to base part of the instruction—proper portion covered by instruction elsewhere given."

Another of the instructions proposed by the defendant bearing upon the dying declaration stated that, if the jury found that Yip Suey was actuated, in making said declaration, "by the desire to wreak vengeance upon some person whom he might believe was a member of a society or a relative of a member of such society which was an enemy of a society to which said Yip Suey belonged . . . ," it would then be their duty wholly to disregard and place no reliance upon such declaration. The court disallowed said instruction on the ground that there was no evidence to which it was pertinent.

The court committed no error by thus disposing of the proposed instructions. An instruction was embodied in the court's charge which admonished the jury to receive with caution the evidence of the dying declaration, "for the reason that the declarant had not been administered an oath, and an opportunity for cross-examination has not been afforded

the defendant, and that the declarant might be influenced against the defendant,'' and for the further reason that the physical condition of the deceased, when making the statement, might have been such as to render questionable the reliability of his declaration.

The instruction given, as will be observed, fully covered the portion of the rejected instruction cautioning the jury, for reasons therein stated, to scrutinize the dying declaration with more than the usual care with which ordinary testimony is received and considered. There was no testimony justifying the implication contained in the rejected instruction that the deceased, in accusing the defendant of having fired the shots into his body, was actuated by "the desire to wreak vengeance upon some person whom he might believe was a member of a society or a relative of a member of such society which was an enemy of the society or tong to which said Yip Suey belonged." Nor was there any testimony from which it may be determined what the declarant's belief was as to a "hereafter," or whether he believed or did not believe that he would, were he to falsely accuse another, subject his soul to punishment after his immortal self had been separated from the flesh. And our law does not require that such fact should be shown to render the declarant's statement admissible. If it is made to appear, as it was made to appear here, that the declaration was made by a dying person under a sense of impending death, and that such declaration related to the cause of his death, then it is sufficient. (Code Civ. Proc., sec. 1870, subd. 4.) Undoubtedly, if it were made to appear that the declarant was wholly obtuse to religious convictions and that he entertained complete disbelief in a future spiritual existence or had no regard whatsoever for the theory of rewards and punishments in the hereafter, his statement *in extremis* would not be supported by those considerations which may naturally be supposed to exercise an overruling influence upon the minds of men in such circumstances, and in such case, even if, nevertheless, the competency of the declaration as evidence would not be destroyed, the credibility of it would be greatly impaired, and when given under such circumstances it should never be submitted to a jury unaccompanied by an explicit admonition by the court that it should be viewed with great caution. In this case, however, no less than in any other, it is

not to be presumed, merely because the declarant might have been an adherent of a heathenish religion—a fact which may reasonably be implied from the race to which he belonged—that he did not as religiously believe in "future rewards and punishments" as those who believe in the Christian religion, and that a statement made by him in the face of impending death would not be attended by the same degree of solemnity or given under the same conception of consequences as that under which a statement under like circumstances would be made by one charged with religious convictions of a more rational and civilized order. In any event, as stated, the court sufficiently enlightened the jury with respect to their duty in considering the dying declaration admitted in evidence, and for the reasons assigned by the court the instructions proposed by the defendant upon that subject were properly rejected.

The refusal to allow some other instructions proposed by the defendant is criticised, but said instructions involved, substantially, a repetition of the statement of principles contained in the rejected instructions which we have above noticed, and it is, therefore, unnecessary to give them special attention herein. In concluding on this branch of the case, we may observe that the court's charge to the jury, as a whole, covered every pertinent point or issue developed in the case correctly and in clear language, and that in this regard, as in all others, the court's conduct of the trial was notably characterized by fairness and impartiality.

6. The witness Corbett, testifying for the people, said that he was near the scene of the shooting when it occurred, and that the defendant, in fleeing therefrom after the firing had ceased, ran north on Hunter Street and entered a house north of the house in which the defendant was found. On cross-examination, after subjecting the witness to extended questioning as to the direction in which the defendant fled from the scene of the shooting, he was asked: "Well, about how many feet were you from him [defendant] when he was running toward you, when you got over here?" The court thereupon interrupted, addressing the attorney: "Mr. Blewett, you have gone over that now several times." Mr. Blewett retorted: "Well, this is very important." The Court: "I know, but you can't go over it and over it, repeat every question. You had him say he was about five feet from the

south line. Go on to a different examination. The court
will not permit you to take the time to go over and over
it; I want to give you a full opportunity for cross-examina-
tion, but not by going over and over.''

It is now claimed that the action of the court in thus limit-
ing the defendant's right to fully cross-examine the witness
upon the lines then being pursued constituted prejudicial
error, particularly in view of the fact that the testimony of
said witness was of singularly vital importance, he having
testified that he witnessed the tragedy and identified the de-
fendant as one of the assailants. It is argued that, if per-
mitted to proceed with his cross-examination upon the lines
upon which he was questioning the witness when interrupted
by the court and further cross-examination upon those lines
curtailed, the attorney for the accused would have probably
succeeded in making the witness definitely and unqualifiedly
say that the defendant, upon the cessation of the shooting,
ran in a *northerly* direction from the scene thereof, and that
thus the verity of his statement that he witnessed the shoot-
ing would have been greatly impaired, if, indeed, his testi-
mony in that regard not altogether impeached, inasmuch as
the defendant was found, shortly after the shooting, in the
rear of a building *south* of the point where the shooting took
place.

As has been shown, the question asked by the attorney when
the court made the order or ruling complained of was: ''Well,
about how many feet were you from him when he was running
toward you, when you got over here?'' Precisely the same
question had several times been previously propounded to the
witness by the defendant's attorney and as many times an-
swered. At page 226 of the transcript, on cross-examination,
it will be found that Corbett stated that the defendant, in
his flight, had passed ''close'' by where the witness was
standing; at page 228, it will be seen that the witness, on
cross-examination, testified that the defendant passed him or
where he was standing at a distance of about five feet; at
page 229, it will be observed that the same question was put
to the witness and that he replied that the accused passed
him at about a distance of five feet from where he (witness)
was standing. At page 231 of the transcript will be found
the question which is responsible for the present discussion.

Even if it might justly be said that the allowance of further questioning of the witness as to the matter to which the question was addressed would have ultimately led, as counsel contend would have been the inevitable result thereof, to a positive statement of the witness that the defendant ran from the place where the shooting occurred in a *northerly* course, and thus the force of the witness' testimony that he saw the shooting destroyed, an answer to the objection is that the witness, as seen, *did* testify that the defendant ran in a *northerly* direction from the point at which the shooting was done, and, although his testimony thereafter appears to be somewhat confusing or hazy upon that point, the fact was, nevertheless, sufficiently brought out to be available to the defense for any purpose to which it might be advantageously put in argument to the jury. But it is manifest that the court's order curtailing further cross-examination did not, nor was it intended to, have the effect of putting an end to the questioning of the witness further as to the direction in which the defendant ran from the scene of the homicide, but that the sole purpose of the order was merely to foreclose further inquiry as to the question of how near the defendant went to the point where the witness stood as he (the defendant) in his flight passed the former. And, very clearly, the witness had been sufficiently questioned as to that fact, and the court as clearly remained within the bounds of a sound judicial discretion in stopping further cross-examination upon that point. As was said in *Phenegar* v. *Paolini*, 27 Cal. App. 381, 391, [149 Pac. 1008, 1012] : ''There must be a limit somewhere to the examination of a witness upon a particular subject, and where, as seems to have been true here, it is evident to the trial court, after a full and exhaustive examination of the witness upon the subject concerning which particular information is desired or desirable, that nothing more can be accomplished by continuing the inquiry than has already been accomplished, then it is clearly within the discretion, and, indeed, the duty, of the court to put an end to the further prosecution of the examination.'' (See, also, *Reed* v. *Clark*, 47 Cal. 194, 201; *People* v. *Mooney,* 132 Cal. 13, 17, [63 Pac. 1070] ; *People* v. *Harlan*, 133 Cal. 16, 22, [65 Pac. 9] ; *People* v. *Rader,* 136 Cal. 253, 254, [68 Pac. 707].)

7. One of the grounds upon which the defendant pressed his motion for a new trial was that of newly discovered evi-

dence, and in support of the motion upon that ground a number of affidavits were filed and presented to the trial court.

The defendant, in support of his *alibi*, attempted to show that, at the time of the shooting, he was in the store of the Quong On Chung Company, at 138 Washington Street, and he testified that he was at said store and therein was corroborated by a number of other witnesses, among whom was one Lem Yeong. In rebuttal, the people called to the stand two Chinese, Hong Lun and Lee Loy, who claimed to have been in the store of the Quong On Chung Company at the time of the shooting, and who testified that neither the defendant nor his witness, Lem Yeong, was in said store at said time. Four of the affidavits filed by the defendant in support of his motion for a new trial on the ground mentioned were made by as many different Chinese, who therein deposed that, when the shooting occurred, Hong Lun was not a farmer, as he had testified, but was a gambler, and that when the shooting occurred he was in a gambling-house at 131–133 East Washington Street, which is located at some distance from the store above named. Two of the affidavits so filed were by two Chinese who therein declared that they were in a rooming-house above the store of the Quong On Chung Company, that they heard the shooting and that at that time Lee Loy was with them in a room in said rooming-house. Two other Chinese made affidavits, which were among those filed, in which they deposed that they saw Lee Loy, immediately after the shooting, come out of the rooming-house above mentioned. Mr. Blewett, attorney for the defendant, made and filed an affidavit in which, after showing the relevancy and alleging the importance of the testimony of the several Chinese affiants, he declared that he had no knowledge of the existence of the evidence to which the affidavits related at the time of the trial, and that he "could not by the use of reasonable diligence have discovered and produced the same upon the former trial."

It is plainly manifest that the effect of the evidence claimed to be "newly discovered" and referred to in the affidavits would merely be to impeach the statements of Hong Lun and Lee Loy that the defendant was not in the Quong On Chung Company store when Yip Suey was shot.

"A motion for a new trial upon the ground of newly discovered evidence has always been regarded by the courts with

a great deal of suspicion and disfavor. It has been said that 'the temptations are so strong to make a favorable showing after a defeat in an angry and bitter controversy, and the circumstance that the testimony had just been discovered when it is too late to introduce it, is so suspicious that courts require the very strictest showing of diligence.' " (*People v. Freeman,* 92 Cal. 359, 366, 367, [28 Pac. 261]; *People v. Sutton,* 73 Cal. 243, [15 Pac. 86]. Hence, it has always been held that whether a motion for a new trial should or should not be granted upon the ground of newly discovered evidence is a proposition which is addressed to the sound discretion of the trial court, and that the denial of a new trial on that ground will not be reversed unless it clearly appears that the court abused its discretion by its action in that regard. (*People v. Loui Tung,* 90 Cal. 377, [27 Pac. 295]; *People v. Tallmadge,* 114 Cal. 427, 430, [46 Pac. 282].) And, furthermore, where the only office of newly discovered evidence is to impeach adverse witnesses, it is insufficient as a basis for granting a new trial. (*People v. Loui Tung,* 90 Cal. 377, [27 Pac. 295]; *People v. Goldenson,* 76 Cal. 328, 352, [19 Pac. 161]; *Stoakes v. Monroe,* 36 Cal. 388; *People v. Anthony,* 56 Cal. 399.) As before stated, and as is plainly apparent from the affidavits themselves, the only purpose which the evidence therein referred to could accomplish, if anything at all, would be the impeachment of two witnesses who testified for the prosecution and whose testimony was itself wholly in impeachment of the testimony of the defendant and his witnesses upon the question of the *alibi* sought to be shown by the accused.

We conclude that there was no error or abuse of discretion in the action of the court refusing to grant the defendant a new trial upon the ground of newly discovered evidence.

No substantial error appearing in the record, the judgment and the order appealed from must be affirmed, and it is so ordered.

Chipman, P. J., and Burnett, J., concurred.