[Crim. No. 402.    Third Appellate District.—December 1, 1917.]

## THE PEOPLE, Respondent, v. IRA LESLIE BONES, Appellant.

CRIMINAL LAW—MANSLAUGHTER—SUFFICIENCY OF INFORMATION.—An information charging that the defendant did willfully, unlawfully, and feloniously kill and murder a human being, sufficiently charges the crime of manslaughter under section 192 of the Penal Code, without alleging whether the offense was voluntary or involuntary manslaughter.

ID.—FORMS OF VERDICT—CLASSES OF MANSLAUGHTER—LACK OF PREJUDICE.—In a prosecution under such an information, the defendant was not prejudiced by the failure of the court to submit to the jury a form of verdict for both voluntary and involuntary manslaughter, although the evidence was such as to have justified the submission of both forms of verdict, since under section 193 of the Penal Code the punishment for manslaughter of either class is the same.

ID.—PROOF OF INTENT—INSTRUCTION.—An instruction that intent to commit a crime is never required to be proven by positive and direct evidence, but may be proven by all the facts and circumstances disclosed by the evidence and testimony in the case, is not objectionable as declaring in effect that the intent to do an unlawful act is presumed from its commission.

ID.—ISSUE OF SELF-DEFENSE—INSTRUCTION.—An instruction that the issue of self-defense should be determined by applying the rule as to what a reasonable man would have done under the circumstances, and that if a reasonable person would have believed he was in danger of receiving bodily harm, and that the danger was pressing and imminent, he would be justified in using such force as would protect him from bodily harm, is proper.

ID.—EVIDENCE—ATHLETIC ABILITY OF DEFENDANT.—Where in such a prosecution it was shown that the deceased was a large man and the defendant a small man, and the defendant attempted to prove that a person of his size could not strike a blow sufficient to kill the deceased, there was no error in permitting the state to show the defendant's ability as an athlete, and that he had several years previously to the trial engaged in boxing-matches.

ID.—NEW TRIAL—NEWLY DISCOVERED EVIDENCE—LACK OF DILIGENCE.—In such a prosecution, it was not an abuse of discretion to deny a new trial on the ground of newly discovered evidence, where such evidence consisted of testimony of persons who were present at the time of the homicide, which occurred in a community of small population, and of testimony of persons as to the habits of the deceased when intoxicated.

Iᴅ.—Rᴜʟᴇ ᴀs ᴛᴏ Nᴇw Tʀɪᴀʟ ғᴏʀ Nᴇwʟʏ Dɪsᴄᴏᴠᴇʀᴇᴅ Eᴠɪᴅᴇɴᴄᴇ.—
Whether a motion for a new trial should or should not be granted
upon the ground of newly discovered evidence is a proposition which
is addressed to the sound discretion of the trial court, and the denial
of a new trial on that ground will not be reversed unless it clearly
appears that the court abused its discretion by its action in that
regard.

APPEAL from a judgment of the Superior Court of
Sonoma County, and from an order denying a new trial.
Emmet Seawell, Judge.

The facts are stated in the opinion of the court.

W. F. Cowan, and C. E. Davis, for Appellant.

U. S. Webb, Attorney-General, and J. Chas. Jones, Deputy
Attorney-General, for Respondent.

HART, J.—The defendant was convicted of the crime of
manslaughter and was sentenced to suffer imprisonment in
the state prison for the term of three and one-half years.

He appeals from the judgment and the order denying his
motion for a new trial.

The homicide occurred in a saloon at Bodega Bay, Sonoma
County, on the twenty-third day of August, 1916. The
deceased, Miles Gaffney, a dairyman by occupation and en-
gaged in said business in the vicinity of Bodega Bay, had been
in the said saloon at several different times during the day
of the homicide. Late in the afternoon of said day—at about
5 o'clock—the defendant, accompanied by one Eugene El-
phick, entered the saloon and there met the deceased.
Elphick and the deceased shortly thereafter engaged in a
dice-throwing game to determine which of the two should pay
for a watermelon. Elphick won the game and the deceased
then said that he would treat to the drinks, whereupon he
placed a piece of money on the bar and the three men,
Gaffney, Elphick, and Bones, drank. A controversy then
arose between Gaffney and Elphick relative to the water-
melon for which the dice game had been played and it ap-
pears that the position of the deceased was that, having paid
for the drinks, he was not obligated to pay for a watermelon
for Elphick. The price of the melon was greater than the

amount paid by Gaffney for the drinks, and it seems, as we understand the record, which is not entirely clear as to that particular matter, Elphick wanted Gaffney to pay him the difference between the two amounts. At any rate, during the progress of the controversy, Elphick appealed to the barkeeper to say whether he was or was not right in his contention, whereupon the defendant interposed the observation: "Yes, that is right," or words to that effect. The deceased thereupon said to the defendant: "What the h—ll are you butting in for?" or "What are you butting in for?" there being testimony that the expression was in both of the forms as thus given.

Continuing the narration of the facts as they were testified to by the witness, Roberts, testifying for the people, it appears that after the above remark by Gaffney to Bones, the latter, addressing the former, said: "You have been giving me the worst of it all day." Gaffney made no reply to Bones, but within a brief space of time thereafter Bones struck Gaffney two blows with his hands or fists on each side of the jaw. At this time Gaffney was standing near or against the wall of the building or room, with his hands down by his sides, and had previously made no demonstration indicating an intention to assault or strike Bones. Upon being struck by Bones as stated, Gaffney turned his head sideways and then fell or slid down the wall to the floor in a lump. Bones hastily left the saloon, exclaiming, as he was passing through the door, "Come on out."

Gaffney did not fall to the floor violently or strike his head either against the wall or floor. It was soon discovered, upon examination, that Gaffney was unconscious, and immediately those present, including the defendant, made an unavailing attempt to resuscitate him by rubbing his body and pouring water over his chest. The deceased was then carried by several men, Bones assisting, to a garage near by, where he expired. A doctor was called to attend him, but arrived after the death of Gaffney.

An autoptical examination of the deceased disclosed that his neck had been severely injured and a small part of the spinal cord chipped or broken, causing a hemorrhage which, declared the doctor who conducted the autopsy, caused his death.

The doctor testified that the injury to the spinal cord was undoubtedly caused by violence, and that it could have been

produced by a blow upon the neck, whereby the neck could be sufficiently thrown out to pinch the spinal cord and so cause the hemorrhage from which Gaffney died.

1. The point first made by the defendant is that the information upon which he was tried and convicted does not charge the crime of manslaughter, or, for that matter, any crime. The charging part of the information is as follows: "The said Ira Leslie Bones, on or about the 23rd day of August, A. D., one thousand nine hundred and sixteen, at and in the county of Sonoma, state of California, did willfully, unlawfully and feloniously kill and murder one Miles Gaffney, a human being, contrary," etc.

It will be observed that there was no attempt to charge the defendant with the crime of murder, as that offense is defined by section 187 of the Penal Code, the element of malice not entering into the charge as laid. The contention of the defendant is, however, that the information fails to charge the crime of manslaughter because it does not directly allege that the killing was done without malice. It is further contended that, assuming that the information sufficiently charged the crime of manslaughter, the information is still insufficient because it does not state whether the crime was voluntary or involuntary manslaughter. It is argued, in support of the last-stated proposition, that the defendant was entitled to be informed by the accusatory pleading of the precise crime for which he was to be tried, and that the information did not furnish him with that information.

Section 192 of the Penal Code defines manslaughter as follows: "Manslaughter is the unlawful killing of a human being, without malice. It is of two kinds: 1. Voluntary—upon a sudden quarrel or heat of passion. 2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."

The information, it will be observed, charges that the killing was willfully, unlawfully, and feloniously done. Thus, it not being charged that the killing was done "with malice aforethought," it necessarily follows and is implied that the crime as charged amounts to manslaughter and no more. So viewing the information, it may properly be said that it charges the crime defined in section 192 of the Penal Code

substantially in the language of said section, and it is, therefore, sufficient to have apprised the defendant of the particular offense to which he was required to plead and interpose any defense which might be available to him.

We do not agree to the proposition that it was necessary to show by proper averment in the information which one of the two kinds of manslaughter it was intended to accuse the defendant of. As where murder is charged and to the jury is left the determination from the evidence under appropriate instructions of which degree thereof, if any, the defendant is guilty, so in a case where manslaughter is charged, it is for the jury to decide upon the evidence under proper instructions of which kind, if of any, the defendant is guilty. Of course, it is a cardinal rule of criminal pleading that a public offense must be so charged and described in the indictment or information that the accused may experience no difficulty in ascertaining from the accusatory pleading precisely what he is expected and will be called upon in law to meet. This is manifestly essential to the interposition in a full and proper manner of any defense the accused may have to make to the charge. The rule thus stated was not varied from in the present case. Whether manslaughter be voluntary or involuntary, it is the unlawful act whereby human life is taken that constitutes the offense in either case. While there exists a distinction between the two kinds of manslaughter, resulting, however, only from the difference in the circumstances under which the act of killing is committed, still no difficulty can be encountered by one accused by an information charging manslaughter generally, or without reference to the particular kind which the evidence may show it to be, to make as complete and perfect a defense against either kind of manslaughter as he might if one of the two kinds were specifically charged. A person so charged can certainly be placed at no greater disadvantage or inconvenience in making his defense than may a person charged with the crime of murder by an information which does not specify, as the law does not require to be specified, the degree of that crime of which it is sought to charge and convict him.

2. The court, in an instruction proposed by the accused, told the jury that the information charged the defendant with the crime of manslaughter, but on its own motion added to said instruction the following: "It is not claimed by the prose-

cution that defendant is guilty of murder in any degree, but it is claimed that he is guilty of involuntary manslaughter. This is the issue for you to determine.''

In turning the case over to the jury, after the reading of the instructions had been concluded, the court presented to the jury two forms of verdict, viz.: 1. ''We, the jury, find the defendant guilty of involuntary manslaughter.'' 2. ''We, the jury, find the defendant not guilty.'' Before the jury retired, however, the court withdrew the form first above given and substituted therefor the following form: ''We, the jury, find the defendant guilty as charged in the information,'' and in this form the jury returned their verdict of conviction.

It is contended that the prosecution of the defendant was conducted solely upon the theory that, if the defendant was guilty of any offense at all, it was of that of involuntary manslaughter, that the giving to the jury of the form of verdict in which they returned their conclusion to the court amounted to an instruction that the defendant might properly be convicted of voluntary manslaughter, and that the direction so given was inconsistent with the instruction first above referred to and, therefore, tended to confuse the jury as to their duty under the evidence.

We think the evidence was such as to have justified the court in submitting to the jury a form of verdict for both voluntary and involuntary manslaughter; but it cannot be said that the defendant was prejudiced by the failure of the court to do so. The punishment for manslaughter of either kind is the same, viz., by imprisonment in the state prison not exceeding ten years (Pen. Code, sec. 193), and we cannot say that the punishment imposed upon the defendant would have been any less than or different from that meted out by the court had the jury found and returned a verdict specifically finding the defendant guilty of involuntary manslaughter. In the matter of punishment, the court appears to have been guided by considerations of clemency, when it is considered that in the exercise of its discretion in that respect it might have imposed a much heavier penalty. Indeed, the punishment imposed—three years and a half in the penitentiary—would seem to be such as might reasonably have been imposed had the accused been specifically adjudged guilty of involuntary manslaughter.

3. The court, after explaining to the jury in apt language that, to consummate a crime, there must be a concurrence or joint operation of act and intent, proceeded: "The intent must be proved. But it is never required of the prosecution to prove an unlawful intent by positive and direct evidence. In many cases such proof could not be made. Intent may be proved by all the facts and circumstances disclosed by the evidence and testimony taken in connection with the case." It is said that this instruction in effect declares "that the intent to do an unlawful act is presumed when the commission of the act is shown." We do not so read the instruction. Of course, the instruction does in effect say that the intent must be inferred from all the circumstances shown in connection with the case, and this is obviously a correct statement of the rule. Indeed, the intent with which any act may be done can be shown in no other way, for intent has its seat in the human mind and cannot be proved as physical facts or those which are the objects of the senses may be shown. It must be shown by external circumstances—that is, as the court stated, by the circumstances surrounding and characterizing the act.

4. It is said that the court's instruction on the law of self-defense was not sufficiently full and complete properly to enlighten the jury on that important feature of the case, the accused having testified that the deceased was the aggressor in the affray, first attacked him, and that he deemed it necessary under the circumstances as they appeared to his mind to strike the deceased for his own protection against bodily injury. There is no ground for complaint in this respect. The court submitted to the jury the law of justifiable homicide as it is written in the code. Furthermore, the court read to the jury the following concrete instruction: "It is the claim of the defendant that he was justified in striking Miles Gaffney, that he acted in necessary defense of his person. I charge you that in determining that issue you must apply this rule: What would a reasonable person, situated as the defendant was, seeing what he saw and knowing what he knew, have done under the circumstances that confronted Bones? If a reasonable person would have believed that he was in danger of receiving bodily harm and that said danger was pressing and imminent, then he would be justified in using such force as would protect him from bodily harm."

The instructions upon self-defense were full and clearly expressed. The difficulty appears to have been that the evidence addressed to that defense did not measure up, in the judgment of the jury, to the law upon that subject as it was stated by the court.

5. Some criticism is made of the instruction in which the court defined the malice which must characterize the act of taking human life to make it murder. The instruction was out of place in this case, as malice is not an element of the offense charged in the information herein. But the instruction was clearly without prejudice.

6. It is urged that the court committed prejudicial error in its ruling whereby the prosecution was permitted to question the witness, Mathews, relative to the defendant's ability as an athlete and the fact that he had several years previously to the trial engaged in boxing-matches.

It was shown by the testimony that the deceased was a very large man, physically, being about six feet in stature and weighing approximately two hundred pounds, and that the defendant was a small man, both in stature and avoirdupois, weighing between one hundred and ten and one hundred and fifteen pounds. On cross-examination, the attorney for the defendant asked the doctor who made the autoptical examination of the deceased and who testified for the people the following question: "In your knowledge as a physician, would you say that a man weighing between one hundred and ten and one hundred and fifteen pounds could deliver a blow that would cause death in that manner?" referring to the cause of Gaffney's death as explained by the witness. The doctor answered: "That depends upon the training of the man as to his power to strike a blow, and the condition of the man receiving it." Other questions on the same line were propounded to the doctor by counsel for the defendant, the obvious purpose thereof being to show that the blows delivered upon the jaws of the deceased by Bones could not have had any direct connection with the cause of death.

The object of the testimony relative to Bones' athletic training and activities was evidently to show that, although small, physically, he was capable of delivering blows with his fists or hands with great force and violence. This testimony was objected to by the defendant, but the court, in overruling the objection, explicitly stated that no prejudice against the

accused because he might have engaged in boxing should be assumed by the jury, "but that the sole purpose is to show whether he is a man of physical power," and solely upon that theory and in rebuttal of any inference unfavorable to the people's case which the jury might draw from the questioning of the doctor by defendant's attorney, as above indicated, the testimony was allowed.

We think the testimony was proper. The issue as to the ability of the defendant to inflict a violent blow upon the person of another was injected or introduced into the trial by counsel for the defendant himself, and it thereupon became important for the prosecution to show, if it could, that by the mere size or physical appearance of the defendant the jury were not to be entirely governed in determining whether the blows inflicted by him upon the deceased were or could have been of sufficient force to produce the injury from the effect of which he is supposed to have died. This is particularly true in view of the fact that the defendant sought to establish the proposition through the cross-examination of the people's main medical witness that the cause of death was chronic heart affliction. But in no event could the testimony complained of have worked very serious damage to the defendant, since the witness Mathews declared that, when he saw the boxing-match between the defendant and another party several years before, he formed the opinion that the accused was a very unskillful boxer.

7. One of the grounds upon which the motion for a new trial was based and pressed was that of newly discovered evidence. In support of the motion on this ground, a number of affidavits by an equal number of persons was filed. Some of the affiants deposed that Gaffney was intoxicated on the day and at the time he was struck by the defendant, and that they witnessed a part of the difficulty leading to the death of Gaffney, and then recited in their affidavits certain facts and circumstances to which they would testify, if a new trial were granted, and which would tend or appear to tend to the vindication of the conduct of the accused in the striking the deceased. Others deposed that they had known the deceased for many years in the vicinity of Bodega Bay and that they could and would testify that, when under the influence of intoxicating liquor, he was of a quarrelsome and belligerent disposition. Again, others of the affiants declared, in addi-

tion to stating that Gaffney was intoxicated on that day and was the aggressor in the trouble with the defendant, that the chief witness for the people, Roberts, was himself greatly intoxicated on the occasion of the difficulty, the inference being that his mental condition was such that he could not have formed a very clear or accurate conception of how it occurred or who started it or how it started, notwithstanding that he was present at the commencement, during the progress, and at the termination of the trouble.

A new trial may be granted "when evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (Pen. Code, sec. 1181, subd. 7.)

It is apparent even from the record as it is presented to this court that the defendant could not have exercised the degree of diligence required to procure the testimony which the affidavits state the makers of them would give in the event of a new trial. Some of the affiants were, as seen, in the saloon at the time the difficulty was begun and in progress. These witnesses should certainly have been known to the defendant. As to the testimony respecting the character of the deceased for peace and quiet, the defendant surely ought to have been able, by proper diligence, to have procured its presentation to the jury. He had known the deceased in Bodega Bay and vicinity, no doubt a small community, so far as population is concerned, in which presumably everybody knows every other resident and is more or less familiar with his personal character and disposition. But, however that may be, it is settled that "whether a motion for a new trial should or should not be granted upon the ground of newly discovered evidence is a proposition which is addressed to the sound discretion of the trial court, and that the denial of a new trial on that ground will not be reversed unless it clearly appears that the court abused its discretion by its action in that regard." (*People* v. *Lim Foon*, 29 Cal. App. 270, 283, [155 Pac. 477]; *People* v. *Loui Tung*, 90 Cal. 377, [27 Pac. 295]; *People* v. *Tallmadge*, 114 Cal. 427, 430, [46 Pac. 282].) Quite clearly it cannot be said in this case that the trial court abused its discretion in denying a new trial on the ground of newly discovered evidence.

Lastly, it is contended that the evidence does not support the verdict. We have by the above recital of the facts shown

that there is no tenable ground for this contention.   The testimony alone of the witness, Roberts, who was in no degree impeached, except in so far as testimony introduced by the defense varied from his, is amply sufficient to support the verdict and to have justified it, if the jury, as appears to be true, believed it.

No legal reason has been shown for sending the case back for a trial *de novo*, and, therefore, the judgment and the order appealed from are affirmed.

Chipman, P. J., and Burnett, J., concurred.