[Crim. No. 201.   Third Appellate District.—April 25, 1913.]

THE PEOPLE, Respondent, v. THEODORE DALLEN, Appellant.

CRIMINAL LAW—ARREST—HOMICIDE IN RESISTING.—The right to resist an unlawful arrest, to the extreme of taking life, cannot be resorted to except where there exist or appear to exist circumstances sufficient to excite the fear of a reasonable man that he is about to be injured in body or limb, or that his life is in danger from the person attempting the arrest.

ID.—HOMICIDE IN RESISTING ARREST—DEGREE OF CRIME.—Where, in resistance to an illegal arrest, the extreme of taking the life of the officer is resorted to, the homicide cannot at most be more than manslaughter.

ID.—KILLING OFFICERS WHO ARE SEARCHING FOR PERSON ABOUT TO COMMIT FELONY.—A conviction of murder in the second degree for killing a night watchman, who with the town marshal was searching, without a warrant, for the defendant in order to make him leave the town upon information that he is about to commit "pimping," is sufficiently supported by the evidence in this case.

ID.—ARREST WITHOUT WARRANT OF PERSON ABOUT TO COMMIT FELONY. It is the right and duty of an officer, without a warrant, to arrest

a person when there is reasonable ground for believing that he is about to commit a felony, such as "pimping."

ID.—ARREST BY DE FACTO OFFICER WITHOUT WARRANT.—A *de facto* peace officer is authorized to make an arrest without a warrant.

ID.—CITIZEN ASSISTING OFFICER IN MAKING ARREST.—One who is called by peace officers to aid in arresting a person is justified in attempting the arrest, irrespective of whether or not he is an officer.

ID.—HOMICIDE—SELF-DEFENSE—INSTRUCTIONS DEFINING THE RIGHT.— The law of self-defense is fully and fairly presented in an instruction which, after specifying in the language of section 197 of the Penal Code, the several occasions when homicide is justifiable, states, among other things, that a person may lawfully take the life of another when the circumstances are sufficient to excite the fears of a reasonable man, and the party killing acts under the influence of such fear; that, to justify such killing, it is not necessary that the danger be actual, but that it is enough if it be apparent; that a party may lawfully act upon appearances which would put a reasonable man in fear of danger; and that he will not, when acting upon such appearances, be held liable, although it should afterward appear that the indications upon which he acted were entirely false and that he was in no actual peril.

ID.—INSTRUCTIONS—REFUSAL BECAUSE COVERED BY OTHERS.—An instruction covered by other instructions that are given, may properly be refused.

ID.—HOMICIDE—WOUND AGGRAVATED BY UNSCIENTIFIC TREATMENT—INSTRUCTIONS.—An instruction in a homicide case that if "a wound is not dangerous in itself, and death is occasioned by grossly erroneous treatment thereof, the person inflicting it is not guilty of murder or manslaughter," is properly refused, if there is no evidence tending to show that the treatment of the wound was grossly erroneous from the standpoint of medical science.

ID.—DYING DECLARATIONS—INSTRUCTIONS INVADING PROVINCE OF JURY. An instruction to the effect that dying declarations, although "admissible from the necessities of the case," should be "received with caution for the reason that the declarant has not been administered an oath, and an opportunity for cross-examination has not been offered the defendant," etc., is properly disallowed.

ID.—ADMISSIBILITY OF DYING DECLARATIONS IN EVIDENCE.—A declaration shown to have been made under a sense of impending death, when the declarant's mental condition was not perceptibly affected or impaired, is admissible in evidence.

APPEAL from a judgment of the Superior Court of Siskiyou County.   James F. Lodge, Judge.

The facts are stated in the opinion of the court.

B. K. Collier, for Appellant.

U. S. Webb, Attorney-General, J. Charles Jones, Deputy Attorney-General, and Frank W. Hooper, District Attorney, for Respondent.

HART, J.—The defendant was convicted of the crime of murder of the second degree, and appeals from the judgment, the record being made up in accordance with the provisions of section 1247 et seq. of the Penal Code.

The facts leading to the shooting of the deceased by the defendant as to which there is no controversy are these: Early on the afternoon of the eighth day of June, 1912, David W. Rinckel, the town marshal of Sisson, in Siskiyou County, was informed by one John Cotton, a night watchman for the Mc-Cloud River Railroad Company, at said town of Sisson, that a ''Greek pimp'' (referring, as it subsequently appeared, to the defendant) had arrived in Sisson and that he was then at a house of ill-fame, known as the ''Buckskin,'' which was conducted by a woman known as Julia Meza. Determined to rid the town of the presence of the ''Greek pimp,'' Rinckel called to his assistance the deceased, Andrew Dougherty, who was then and for some years had been a night watchman or night policeman of Sisson, and the two, between the hours of eight and nine o'clock of the evening of the day mentioned, proceeded to the house of prostitution for the purpose, as Rinckel, in testifying, expressed it, of ''giving the pimp the run,'' or to be more explicit, ordering him to leave the town. Upon reaching the bawdy house, Rinckel and Dougherty entered and saw the proprietress, with whom they held a brief conversation, and then returned to the outside. They thereupon visited another house of prostitution, situated not far distant from the ''Buckskin,'' but after a few minutes returned to the latter place. Looking through the window of one of the rooms of the house, they saw the defendant and a man named Olsen sitting at a table and partaking of a meal. Rinckel immediately thereafter entered the house by the front door, leaving Dougherty on the outside. The defendant immediately became aware of Rinckel's presence in the house,

and he thereupon jumped through a window to the outside and through an opening crawled and secreted himself underneath the house. Rinckel, not knowing that the defendant had left the house, remained therein and made a search for him. In the mean time, Dougherty had heard the sound of noises proceeding from underneath the house and, suspecting that the defendant had there sought refuge, kneeled down and looked through the opening through which the defendant had passed, striking matches in order to enable him the better to see whether the defendant was under the house. It was at about this time that Dougherty was shot, the bullet passing through the fleshy part of his left leg, between the knee and ankle.

After the deceased and the defendant exchanged a number of shots, the latter fled from the house and ran to a point about seventy-five or a hundred feet from said house, and remained there until after an automobile had arrived and conveyed Dougherty to the home of his sister, when he returned to the bawdy house, where, shortly thereafter, while he was in the act of descending the stairway leading to and from the upper story of the bawdy house, he was apprehended by one Robinson, who had joined in the search for him, and turned over to the custody of the marshal. At the time of his arrest, it appears, he was holding in his hand the pistol with which he did the shooting, and upon being arrested delivered the weapon to the possession of Robinson.

The defendant did not deny having fired at the deceased, but there is a conflict in the evidence as to which of the two men started hostilities or fired the first shot. In his *antemortem* statement concerning the immediate circumstances of the shooting, the deceased, among other things, said: ''While I was looking for him, thinking he was under the house, Marshal Rinckel being inside looking for him, I was shot through the left leg by the person who was shortly afterward arrested by Marshal Rinckel and who was the party we were endeavoring to arrest when I was shot. The man who shot me shot at me twice before I shot at him—I then shot at him six times, but missed him—he shot at me once more after I began shooting. I make this declaration knowing that I am dying.''

The story of the defendant is, in substance, that the deceased and Rinckel were looking under the house for him and

that he heard Rinckel say to the deceased that he would like to find the "s—n of a b—ch"; that he (defendant) thereupon became very much frightened, and that, fearing that he would be shot or hurt by the officers, undertook to leave his hiding place by the entrance through which he went under the house; that, as he was about to pass through the entrance, he was shot at several times by the deceased, none of the shots taking effect. Finally he succeeded in getting from beneath the house and started to run, when the deceased again fired a shot at him and he thereupon, while still running, returned the fire, discharging three shots at the deceased.

As stated, shortly after receiving the wound, Dougherty was taken to the home of his half-sister, in Sisson, where he was attended by Dr. Gouguet, who then cleansed and dressed the wound, and who, unassisted by any other physician, continued to attend and treat the deceased until Monday, the tenth day of June, when symptoms of a gangrenous condition in the wound made an appearance. The doctor thereupon immediately decided upon a consultation and in furtherance of that purpose telephoned to Dr. Legge, chief surgeon of the hospital of the McCloud River Railroad Company, located a short distance from Sisson. Dr. Legge was unable to go to Sisson on Monday, and it was finally decided to be the better course to convey the patient to the hospital named. This was done on the following morning. Arriving at the hospital, the deceased was examined by Drs. Legge and Gouguet, and it was found that the patient's condition was such, by reason of the infection in the wound, that amputation of the limb was the only alternative for the preservation of his life. Dougherty, having been informed of the conclusion thus reached by the physicians, consented to the operation. He was thereupon placed under the influence of an anesthetic and the operation was proceeded with. An amputation near the thigh was deemed to be necessary by the surgeons and, accordingly, incisions through the skin and underlying tissues were made and it was then discovered that the gangrenous condition had developed to such an extent that the patient's life could not be saved by an operation or any other means, and amputation was, therefore, abandoned. Dougherty died the following Thursday—the thirteenth day of June, 1912, five days after the wound was inflicted.

The points submitted by the defendant for a reversal of the judgment are, generally stated, that the verdict is not supported by the evidence and that he was denied a fair trial by the action of the court in refusing to adopt and read to the jury certain instructions proposed by him.

The first point is predicated mainly upon the proposition that, since, as is the claim, the defendant had committed no crime, or had not been formally charged with the commission of a public offense, the officers had no right in law to undertake to arrest him, the argument in support of that proposition in effect necessarily being that the defendant had the right to go to any length which he might deem necessary to protect or defend himself against what he might have conceived to be an attempted unlawful restraint of his person or interference with his personal liberty. There can be no doubt that a person has the right to "resist an unlawful attempt to subject him to arrest" (*People* v. *Craig*, 152 Cal. 43, 45, [91 Pac. 997]), but the right to oppose an illegal arrest by resorting to the extreme measure of taking life has never been and will never be laid down as a sound doctrine of the law, except where there exist or appear to exist to the person thus sought to be arrested, at the time the arrest is being attempted, circumstances which, being sufficient to excite the fear of a reasonable man, would justify in him the belief that he was about to be injured in body or limb or that his life was in danger of being destroyed by the party or officer attempting to make the arrest, in which case a perfect defense would be open to the slayer.

It is also to be conceded that where, in resistance to an illegal arrest, the extreme of taking the life of the party attempting such arrest is resorted to, the act of the party thus resisting could not at the most, under ordinary circumstances, transcend in criminal culpability the grade of manslaughter. In the present case, however, the evidence is sufficient to support the necessarily implied finding of the jury that Rinckel and the deceased had, prior to attempting the apprehension and arrest of the defendant, reasonable cause to believe that the defendant was guilty of the crime of "pimping," which is denounced as a felony by an act of the legislature of 1911 (Stats. 1911, p. 10), or that he had made his advent into the town of Sisson for the purpose of carrying on that illicit

business and thus committing that felony. In either case, the officers were authorized to arrest him without a warrant. (Pen. Code, sec. 836, subds. 1, and 2.) We say "in either case," for, while we have found no express code provision authorizing the arrest, without a warrant, of a person who, there is reasonable ground for believing, is about to commit a felony, there can be no doubt that it is the right and, indeed, the duty of an officer, where the circumstances require it, to make such an arrest before the damage is done.

As has already been related, the town marshal had been informed that the defendant was and had been engaged in "pimping," and that he was, at the time such information was obtained, at a bawdy house conducted in Sisson, known as the "Buckskin." The marshal conveyed this information to the deceased, who was a night watchman of Sisson, and requested and induced the latter to accompany him to said house for the purpose of ordering the defendant to leave town. Upon arriving at the house, which was near the hour of nine o'clock at night, they, from the outside, looked through a window and saw the defendant, with some others, sitting at a table apparently eating. When the marshal entered the house on the second occasion (he having previously been in the house without finding the party he was looking for) the defendant, having been informed by the "landlady" of the purpose of the presence of the officer, undertook to evade the latter and to accomplish that purpose jumped through a window and took refuge under the house. Thus it appears that the information received by Rinckel concerning the defendant—that is, that he was engaged in the illicit business of "pimping"—was to some extent confirmed by the fact that he was found in a house of prostitution, eating a meal as though perfectly at home, and by his act of fleeing from the house upon hearing that the officers were in pursuit of him. These last mentioned circumstances, together with the information previously received by the officers, were sufficient to establish in the minds of the latter reasonable or probable cause for believing that the defendant had committed or was in Sisson to commit a felony, and this was all that was required by the law to justify the officers in pursuing and placing him under arrest.

As before shown, the evidence as to the circumstances immediately connected with or attending the shooting is decidedly conflicting, but it is nevertheless sufficient to support the finding of the jury, as implied from their verdict, that the defendant, without legal justification or excuse, fired upon and wounded the deceased. It is true, as counsel for the defendant points out, that the deceased made a statement after he was wounded which might appear to support, in a measure, the testimony of the defendant that Dougherty fired the first shot. The statement referred to was to the effect that, when shot by the defendant, the deceased was endeavoring to "smoke" the former out from under the house. Precisely what the deceased meant to say or imply by the use of the word "smoke" in that connection, is and must remain a matter of conjecture. Of course, the theory of the defendant was and is (and it is not an unreasonable theory upon its face) that Dougherty thus admitted firing at the defendant while the latter was under the house before the defendant had fired a shot. This theory, however, is not consistent with the dying declaration of the deceased, who therein stated that he was fired upon twice and was wounded by the defendant before he shot at the latter. But the remark could possess such significance only as the jury, in weighing the testimony of Dougherty, might deem themselves justified in ascribing to it, and the verdict, of course, conclusively implies that it exercised no such influence upon them, in their consideration of the evidence, as to generate in their minds disbelief in the dying declaration of the deceased or a reasonable doubt of the guilt of the defendant of the degree of murder of which they convicted him.

We attach no importance to the question, bearing upon the right of the deceased to arrest the defendant, and which seems to have been given considerable attention at the trial, whether the deceased, at the time he attempted to arrest the defendant, was an officer either *de jure* or *de facto*. The evidence, to our minds, shows that he was at the least a *de facto* officer and as such was, of course, authorized to exercise and perform the duties of a policeman, and, therefore, to make an arrest. But, having been called upon by the town marshal, concededly a duly qualified and acting peace officer, to aid in arresting a

person for a crime, it is immaterial whether the deceased was an officer or not.    (Pen. Code, sec. 839.)

Complaint is made that the court seriously erred by its refusal to give the instructions, proposed by the defendant, bearing upon the question of self-defense.   The law upon that subject was fully and fairly presented to the jury by the court in instructions Nos. 14 and 15, wherein, after specifying in the language of section 197 of the Penal Code, the several occasions on which homicide is justifiable, the jury were told, among other things, that a person may lawfully take the life of another when the circumstances are sufficient to excite the fears of a reasonable man and the party killing acted under the influence of such fear; that, to justify such killing, it is not necessary that the danger be actual, but that it is enough if it be apparent; that a party may lawfully act upon appearances which would put a reasonable man in fear of danger and that he will not, when acting upon such appearances, be held liable, although it should afterward appear that the indications upon which he acted were entirely false and that he was in no actual peril.   The instructions upon the law of self-defense requested by the defendant could not, if given, have added any more light upon that question than was furnished by the instructions allowed and read to the jury, and their rejection was not, therefore, erroneous.

It is further objected that the court erred to the great damage of the substantial rights of the defendant by rejecting the instructions, requested by him, which would have submitted to the jury the question whether Dougherty's death was proximately caused by the gunshot wound or by the malpractice of the physician who treated him.   One of said instructions, which will serve to fully exemplify the principle sought to be carried to the jury through all the instructions proposed by the defendant upon that subject, reads as follows: "The court instructs you that if a wound is not dangerous in itself and death is occasioned by grossly erroneous treatment thereof, the person inflicting it is not guilty of murder or manslaughter.   Therefore, if you find in this case that the wound alleged to have been inflicted upon Andrew Dougherty by the defendant was not in itself dangerous, and that the death of Andrew Dougherty was occasioned by grossly erroneous treatment, then you must acquit the defendant."

We need not discuss the question whether the foregoing instruction involves a strictly accurate abstract statement of the law upon the subject to which it relates (see *People* v. *Lewis,* 124 Cal. 551, [45 L. R. A. 783, 57 Pac. 470]) ; for it is very clear that it is not applicable to the evidence, and doubtless for that reason the court below rejected it and other instructions of similar import which were offered by the defendant.

There is absolutely no evidence showing or tending to show that the treatment of the wound of the deceased by the physician was ''grossly erroneous'' from the standpoint of the medical science. Dr. Gouguet, the local physician, to whose care and treatment the deceased was first committed, testified that he found a flesh wound in the left leg of the deceased; that it was not necessarily a mortal wound and that no danger from such a wound need ordinarily be apprehended except from infection. He testified that the first thing he did, in the treatment of the wound, was to sterilize, by means of tincture of iodine, the skin around the points of entrance and exit of the bullet; that he inserted a small gauze drain in each wound and applied a sterile dressing thereto, after which he bandaged the wounds. As before shown, on the following Monday evidence of an infection in the wound appeared and a consultation with Dr. Legge was had, with the result as hitherto related. Both Dr. Gouguet and Dr. Legge testified that the infection appeared in an unusual form, technically called formulating or gaseous gangrene—a form of gangrene which travels with great rapidity and often, before the usual symptoms by which the presence of the infection is manifested, permeates and destroys the tissues of the body to such a degree that it cannot be arrested even by a resort to the most radical or drastic treatment, such as amputation of the affected parts.

Dr. Legge, chief surgeon of the McCloud River Railroad Company, indorsed the treatment practiced by Dr. Gouguet and declared it to have been the only proper course to pursue in such a case.

The defendant introduced a number of other physicians as expert witnesses, the obvious purpose of which was to show that the treatment administered by Dr. Gouguet was not according to the usual or more scientific practice in such a case;

but, after a careful consideration of their testimony, we have been unable to discover any substantial departure in the treatment practiced by Dr. Gouguet from that which the doctors for the defense testified would have been the treatment resorted to by them under the circumstances. Indeed, Dr. Ward, one of the defendant's witnesses, declared that the course of treatment practiced by Dr. Gouguet was "most decidedly" such as he would have followed had the case been brought to him.

The only plausible ground upon which it might be said that Dr. Gouguet did not display, in the treatment of the case, that degree of skill which is expected in a medical doctor in such a case was in the delay in discovering the infected condition of the wound. Perhaps to the lay mind it might appear that, where a deadly infection appears in a wound, symptoms thereof ought to be readily observable and definitely recognized very shortly after the infection actually appears. But all the doctors who testified in this case agreed that an infection of the character of that which developed in Dougherty could make dangerously rapid progress before the symptoms thereof were such as to furnish very satisfactory evidence of its presence. In the present case, the moment that the attending physician saw reasons for suspecting that the wound had been visited by an infection, he arranged for a consultation and the evidence shows that, in the further treatment of the case in the condition in which it finally developed, he proceeded with reasonable dispatch on recognized scientific lines. In any event, there is, as before declared, no evidence in the record which even tends to disclose that, at any stage of the case, the treatment of the deceased by the physicians was "grossly erroneous," and, under the well-settled rule that instructions must be applicable to the evidence, the court properly rejected and refused to read to the jury the instructions under consideration.

The instruction to the effect that dying declarations, although "admissible from the necessities of the case," should be "received with caution for the reason that the declarant had not been administered an oath and an opportunity for cross-examination has not been offered the defendant," etc., was properly disallowed. The instruction was addressed entirely to the question of the weight or credence which the

jury should attach to the declaration and the giving of it would, therefore, have been an encroachment by the court upon the province of the jury. Besides, the fact that the declaration was not made under oath in the presence of the jury cannot, in the very nature of things, be set up as a reason why it should be viewed or considered with a greater degree of caution than should any other character of testimony. The very solemnity of the circumstances under which a declaration *in extremis* is made is very justly considered by the law as creating an obligation equal to that which is imposed by a positive oath in a court of justice. (1 Greenleaf on Evidence, sec. 156.) And in this connection we may express the opinion that the dying declaration was properly admitted. It was shown to have been made under a sense of impending death and that when made the declarant's mental condition was not perceptibly affected or impaired. An examination of the objections to the declaration will show that they are addressed to its weight rather than to the question of its competency as evidence.

We have discovered no sound legal reason for remanding the cause, and the judgment is, therefore, affirmed.

Chipman, P J., and Burnett, J., concurred.