[No. B037394. Second Dist., Div. Three. Oct. 13, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
LYNNARD ARVANT SMITH, Defendant and Appellant.

**COUNSEL**

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Edward T. Fogel, Jr., William T. Harter and Cindy M. Lopez, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ARABIAN, J.—**

### INTRODUCTION

John of Gaunt:

"O! but they say the tongues of dying men
"Enforce attention like deep harmony:

"Where words are scarce, they are seldom spent in vain
"For they breathe truth that breathe their words in pain."[1]

The dying declaration stands as one of the earliest recognized exceptions to the rule excluding most hearsay evidence from trial proceedings, and the foundation for this exception is deeply rooted in policy considerations of human philosophy and psychology. Yet, since well before the enactment of the Evidence Code in 1967, appellate courts have not addressed the question of what instruction, if any, the trial court should provide the jury in its evaluation of such evidence. In this case, although the court did not misstate the law in its sua sponte pronouncement, we conclude that the jury should not have received any instruction on the point. However, we find the error did not result in a miscarriage of justice, and affirm defendant's conviction for first degree murder (Pen. Code, § 187).

## FACTUAL AND PROCEDURAL BACKGROUND

The victim, Miles Weary, received fatal injuries shortly after 11 p.m. on February 11, 1986. He had just finished putting gas in his car at a station on the corner of Normandie Avenue and Century Boulevard. Two friends, Bruce Browder and Gregory Haney, were with him. As Weary was about to drive onto Normandie, a black Chevrolet Blazer with tinted windows containing two or three individuals pulled up next to the passenger side of his vehicle and honked its horn.

At that point, Browder saw the driver's window of the Blazer come down "pretty quick" and the driver point a gun in Weary's direction. The assailant fired as many as six shots in rapid succession and drove off. Melvin Salguero, an attendant at the station who was standing in a nearby cashier booth, identified defendant as the person driving the Blazer.

Los Angeles Deputy Sheriff Robert Rifkin arrived at the scene moments after the shooting. He was familiar with the victim from previous contacts and spoke with him as he lay in the street. Rifkin had prior training as a paramedic and "told Miles that he was shot and hurt badly, and that he was dying." When Rifkin asked who shot him, Weary replied, " 'Spodie did it, . . . Spodie from 90th Hoovers.' " Further testimony disclosed that the victim and the defendant were members of rival street gangs and that defendant was known as "Spodie."

Bridgette Lewis testified the two men had prior contact the evening before the shooting. She had been with Weary about 11:30 p.m. as they

---
[1] William Shakespeare, *Richard II,* act 2, scene 1.

were driving on 99th Street. While they were at a stop sign, defendant drove alongside from the opposite direction in a black Blazer. Weary was unfamiliar with defendant, but Lewis identified him as "Spodie" from "Nine-Oh," referring to the street gang 90th Hoover Crips. The victim was about to pull away, but another car blocked him; and defendant came over and began striking him through the driver's window. When Weary also got out of his car, the two men exchanged several blows. Weary was forced to abandon his car on the street when one of defendant's companions took the keys from his ignition. Defendant's fingerprints were later found on the driver's side of the victim's car.

Weary suffered two gunshot wounds, either of which would have been fatal. The coroner found two .22-caliber bullets in his body, which appeared to have entered from the right side. Another bullet fired from the same gun was found in the passenger door of the victim's car.

Several days after the killing, defendant was interviewed by Deputy Sheriff Isaac Aguilar. He initially stated he knew nothing except that someone had been killed; and he denied recently being in the area of 99th Street and Normandie Avenue or knowing the victim. When Aguilar stated he had information to the contrary, defendant admitted knowing the victim and fighting with him the night before the shooting in the area of 99th Street and Budlong.

Defendant offered an alibi defense. According to Melanie Battle and her mother Viola Rodriguez, defendant had been at the Rodriguez house at 96th Street and Western Avenue from 4 a.m. February 11 until at least 3 or 4 p.m. February 12 for safety reasons following an unrelated shooting of Battle's friend Kelly Mozier. Mark Cofield, a friend of defendant, owned a black Blazer and had made inculpatory statements regarding the killing to a mutual friend and gang member.

### ISSUES PRESENTED

Defendant raises the following issues on appeal:

(1)  Whether the trial court erred by instructing on the victim's dying declaration;

(2)  Whether the court properly admitted Deputy Rifkin's opinion as to the veracity of the dying declaration;

(3)  Whether the court should not have excluded hearsay evidence of Gregory Haney's identification of Mark Cofield as the assailant; and

(4) Whether substantial evidence supports the jury's finding of premeditation and deliberation.

DISCUSSION

## I. *Dying Declaration Instruction*

Over defendant's objection, the court gave the following instruction: "A declaration made by a person about to die has a substantial guarantee of trustworthiness. 'The very solemnity of the circumstances under which the declaration in extremis is made is very justly considered by the law as creating an obligation equal to that which is imposed by a positive oath in a court of justice.' "

To evaluate the propriety of the instruction we undertake a brief review of the genesis of the law.[2] "Of the doctrines which authorize the admission of special classes of out-of-court statements as exceptions to the hearsay rule, the doctrine relating to dying declarations is the most mystical in its theory and traditionally the most arbitrary in its limitations. The notion of the special likelihood of truthfulness of deathbed statements was widespread, of course, long before the recognition of a general rule against hearsay in the early seventeen hundreds. It is natural enough, then, that about as soon as we find a hearsay rule we also find a recognized exception for dying declarations." (McCormick, Evidence (3d ed. 1984), § 281, p. 828, fn. omitted; see 5 Wigmore, Evidence (Chadbourn rev. ed. 1974) § 1430; see also *Thurston* v. *Fritz* (1914) 91 Kan. 468-474 [138 P. 625-627].) Wigmore further explains "the nature of the circumstantial guarantee of trustworthiness": "It is separable . . . into three elements. (1) The declarant, being at the point of death 'must lose the use of all deceit'—in Shakespeare's phrase. There is no longer any temporal self-serving purpose to be furthered. (2) If a belief exists in a punishment soon to be inflicted by a Higher Power upon human ill-doing, the fear of this punishment will outweigh any possible motive for deception, and will even counterbalance the inclination to gratify a possible spirit of revenge. (3) Even without such a belief, there is a natural and instinctive awe at the approach of an unknown future—a physical revulsion common to all men, irresistible, and independent of theological belief."[3] (5 Wigmore, *supra,* § 1443.)

---

[2] Admissibility of dying declarations in California is now governed by Evidence Code section 1242: "Evidence of a statement made by a dying person respecting the cause and circumstances of his death is not made inadmissible by the hearsay rule if the statement was made upon his personal knowledge and under a sense of immediately impending death."

[3] California case law has specifically rejected the necessity of any proof of the declarant's religious convictions. (See, e.g., *People* v. *Lim Foon* (1915) 29 Cal.App. 270, 277-279 [155 P. 477]; see also Evid. Code, § 789.)

In the early case of *Rex* v. *Woodcock* (1789) 1 Leach Cr. C. 500, 502, Lord Chief Baron Eyre articulated the rationale thusly: "[T]hat they are declarations made in extremity, when the party is at the point of death, and when every hope of this world is gone: when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth; a situation so solemn, and so awful, is considered by the law as creating an obligation equal to that which is imposed by a positive oath in a Court of justice." Although the exception has been considerably narrowed in its application over the last two centuries,[4] the rationale remains viable; and courts continue to rely upon it in discussing issues related to instructions or admissibility of such evidence. (See, e.g., *People* v. *Thomson* (1905) 145 Cal. 717, 723 [79 P. 435]; *People* v. *Sanchez* (1864) 24 Cal. 17, 23-24; *People* v. *Profumo* (1913) 23 Cal.App. 376, 378 [138 P. 109]; *People* v. *Dallen* (1913) 21 Cal.App. 770, 780-781 [132 P. 1064].) Indeed, the instruction before us derives directly from the language of *Rex* v. *Woodcock, supra.*

Despite the substantial guaranty of trustworthiness underlying this exception, courts have warned against uncritical acceptance. "This species of testimony should always be received with the greatest caution, and too much care cannot be observed by the Court in scrutinizing the primary facts upon which its admissibility is grounded. No person is entirely exempt from a disposition to excuse and justify his own conduct, or to inflict vengeance upon one at whose hands he has suffered a grievous wrong; and in the eye of the law this proclivity is presumed, in cases like the present, to be overcome and silenced only by the presence of almost immediate death." (*People* v. *Sanchez, supra,* 24 Cal. at p. 24; *People* v. *Lawrence* (1863) 21 Cal. 368, 372; see also *People* v. *Thomson, supra,* 145 Cal. at p. 723; but see *People* v. *Dallen, supra,* 21 Cal.App. at pp. 780-781.) ■ Concomitantly, although the declarant is not a "witness" in the statutory sense (*People* v. *Thomson, supra,* 145 Cal. at p. 723; see also Evid. Code, §§ 240, 710), a

---

[4]Originally, the only limitations on the admissibility of dying declarations were "that the declarant must at the time he made his statement have been conscious that death was near and certain" and "that the declarant must be dead when the evidence is offered." (McCormick, *supra,* § 282, pp. 829-830, fns. omitted.) Once these requirements were met, dying declarations "were admitted in civil and criminal cases without distinction . . . ." (*Id.,* § 283, p. 830, fn. omitted.) However, subsequent judicial construction began to circumscribe admissibility until the courts would permit this evidence only in criminal cases "where the death of the deceased [declarant] [was] the subject of the trial, and the circumstances of the death [were] the subject of the declaration. [Citation.]" (*People* v. *Hall* (1892) 94 Cal. 595, 599 [30 P. 7], overruled on other grounds in *People* v. *Spriggs* (1964) 60 Cal.2d 868, 875 [36 Cal.Rptr. 841, 389 P.2d 377]; see former Code Civ. Proc., § 1870, subd. 4; see generally McCormick, *supra,* § 283, pp. 830-832.) State and federal codification of the rules of evidence as well as promulgation of the Revised Uniform Evidence Rules (1974) have reenlarged the scope of the law so that now, for example, California admits dying declarations in both criminal and civil matters. (Evid. Code, § 1242; see also, e.g., Fed. Rules Evid., rule 804(b)(2).)

dying declaration is subject to the same credibility evaluations by which in-court testimony is tested. (See *People* v. *Thomson, supra,* 145 Cal. at p. 723; *People* v. *Sanchez, supra,* 24 Cal. at p. 26; *People* v. *Lawrence, supra,* 21 Cal. at p. 372; see also *People* v. *Collup* (1946) 27 Cal.2d 829, 837 [167 P.2d 714].)

As a logical corollary, the trial court's ability to focus on or unduly emphasize this evidence should be commensurately circumscribed. (See, e.g., *People* v. *Thomson, supra,* 145 Cal. at p. 723.) For example, in other evidentiary contexts, "[i]t has been repeatedly held to be improper for the court to single out a particular witness and to charge the jury how his evidence should be considered. [Citations.]" (*People* v. *McDonnel* (1949) 94 Cal.App.2d 885, 889 [211 P.2d 910]; *People* v. *Lyons* (1958) 50 Cal.2d 245, 271 [324 P.2d 556].) On the other hand, the California Constitution currently grants the trial judge discretionary authority to "make such comment on the evidence . . . as in its opinion is necessary for the proper determination of the cause." (Cal. Const., art. VI, § 10; see also *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 766-767 [230 Cal.Rptr. 667, 726 P.2d 113].)

█ Specifically, as to appropriate instructions on dying declarations, "[t]here has been much theorizing in texts and opinions as to the weight to be given to dying declarations, abstractly or in comparison with the testimony of a witness. In consequence the practice has grown up in some states of requiring or permitting the judge to instruct the jury that these declarations are to be received with caution. In other states such instructions have been held to be improper. Again one court has required that the jury be told that a dying declaration is not to be regarded as having the same value and weight as sworn testimony. . . . While there may be merit in a standardized practice of giving cautionary instructions, the direction to give the declaration a predetermined fixed weight seems of questionable wisdom. The weight of particular dying declarations depends upon so many factors varying from case to case that no standardized instruction will fit all situations. Certainly in jurisdictions where the judge retains his common law power to comment on the weight of the evidence, the dying declaration is a most appropriate subject for individualized comment. . . ." (McCormick, *supra,* § 286, pp. 833-834, fns. omitted.)

We find the foregoing commentary persuasive, particularly in light of the general rule resolving conflicts in the law in favor of criminal defendants. In the instant case, laudable as the court's efforts may have been in elucidating a point of law, the instruction tended to draw the jury's attention to this evidence, isolating it and thereby implying some authoritative assessment of its credibility and effect upon the determination of defendant's guilt. As such, it was more than an expression of the court's evaluation of the

evidence in the form of sanctioned comment. The hallowed right to trial by jury cannot countenance any invasion of the province occupied exclusively by the trier of fact. To the extent the instruction tended to do so, we disapprove the practice. Once the court makes a preliminary determination to admit a statement as a dying declaration (see Evid. Code, § 405; *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 966, fn. 13 [127 Cal.Rptr. 135, 544 P.2d 1335], cert. den. 429 U.S. 805 [50 L.Ed.2d 65, 97 S.Ct. 38]; see also *People* v. *Profumo, supra,* 23 Cal.App. at pp. 378-379), only the jury can assay the weight of that evidence.[5] (See *People* v. *Dallen, supra,* 21 Cal.App. at p. 781.)

Having so concluded, however, we find for several reasons the error was not prejudicial. (Cal. Const., art. VI, § 13.) First, the instruction correctly stated the law even if the legal principle should not have been reduced to a specific direction to the jury. (See *People* v. *Adams* (1987) 196 Cal.App.3d 201, 204-205 [241 Cal.Rptr. 684]; *People* v. *Odom* (1937) 19 Cal.App.2d 641, 649 [66 P.2d 206].) Second, it did not create a presumption or otherwise require the jury to draw any particular conclusion as to the declarant's veracity. (See *People* v. *Lyons, supra,* 50 Cal.2d at pp. 270-271.) Third, the court could have made the same point in the form of comment on the evidence. *(People* v. *Melton* (1988) 44 Cal.3d 713, 735 [244 Cal.Rptr. 867, 750 P.2d 741]; *People* v. *Rodriguez, supra,* 42 Cal.3d at p. 766.) Hence, the instruction did not improperly imply an opinion as to defendant's guilt. (See *People* v. *Rodriguez, supra,* at p. 766.)

Finally, the record establishes that defense counsel adequately apprised the jury in his closing argument of the factors and considerations appropriate to the credibility assessment of a dying declarant: "Now, the instruction you received from the court having to do with the dying declaration is nothing more than the effect of administering an oath to a person that's living. There's no further impact than that. In other words, a dying person can't be asked to take an oath and there's a certain degree of trustworthiness and [*sic*] things that he said. So, therefore, the instruction that you'll

---

[5]This conclusion conforms to the procedural change brought about by the enactment of the Evidence Code respecting the court's determination of facts foundational to the admission of dying declarations. Earlier case authority required the jury "to disregard hearsay admitted as dying declarations or spontaneous statements unless it [found] beyond a reasonable doubt the existence of the applicable preliminary fact, namely the declarant's sense of impending death [citations] or the spontaneity of his statement [citation]. These cases, however, predate the Evidence Code, and the determination of the preliminary fact on a hearsay challenge to a proffered confession, dying declaration or spontaneous statement is now vested solely in the trial court as opposed to earlier procedures whereby the court first determined the existence of the preliminary fact and, if so found, submitted the matter to the jury with instructions to independently find the existence of the preliminary fact before considering the proffered statement on the merits. . . ." (*People* v. *Tewksbury, supra,* 15 Cal.3d at p. 966, fn. 13; see, e.g., *People* v. *Thomson, supra,* 145 Cal. at pp. 723-725; *People* v. *Profumo, supra,* 23 Cal.App. at pp. 378-379.)

get about a dying declaration is really swearing him in. And once a person is sworn in, his credibility as a witness becomes an issue. He's to be treated like any other percipient witness in a case. That dying declaration instruction does not tell you to believe him. It says scrutinize it just like anybody else. Because as we discussed during the course of voir dire, an oath does not vouch for the truth any more so with Mr. Weary than it does with any other live witness that's sworn to testify in the case."

In addition, the defense offered expert testimony on the various factors affecting eyewitness perception; and the court fully instructed on the criteria relevant to determining credibility of witnesses. (See Evid. Code, § 780.) "Although the giving of the general instructions may not alone preclude reversal for [improper instruction] [citation], their use is relevant, in combination with counsel's arguments and cross-examination, to a determination of whether the error was prejudicial. [Citation.]" (*People* v. *Wright* (1988) 45 Cal.3d 1126, 1149 [248 Cal.Rptr. 600, 755 P.2d 1049]; *People* v. *Lee* (1987) 43 Cal.3d 666, 677-678 [238 Cal.Rptr. 406, 738 P.2d 752].)

Although the evidentiary impact of the victim's dying declaration obviously was significant, the objectionable instruction did not compel the jury to accept it or to view it as having any force and effect beyond that sanctioned by the law well prior to the formulation of the hearsay rule. Thus, under the circumstances of this case, we do not find that the jury would have reached any different verdict had the court omitted it. (See generally *People* v. *Lee, supra,* 43 Cal.3d at p. 679.)

## II. *Opinion Evidence of Dying Declarant's Veracity*

■ Over defense objection, Deputy Rifkin testified he believed the victim when he made his dying declaration. Rifkin had known Weary from street contacts for at least two years; and, although this contact did not result in a personal relationship or friendship, he felt trusted and did not think the victim was lying when he said, " 'Spodie did it.' " He based this conclusion on the following: "Because I knew Miles for a while and talked to him. He was usually pretty honest with me and open, and he would tell me what was going on with him and his gang and other gangs. [¶] And I could tell by the tone of his voice when I was leaning over him that he was sincere about it." Later, the witness described the victim's voice as "shallow and soft" and having "a lot of concern in his voice, fair concern, when he was talking . . . ."

"If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is:

"(a) Rationally based on the perception of the witness; and

"(b) Helpful to a clear understanding of his testimony." (Evid. Code, § 800.)

▇ "Lay opinion about the veracity of particular statements by another is inadmissible on that issue. As the Court of Appeal recently explained [citation], the reasons are several. With limited exception, the fact finder, not the witnesses, must draw the ultimate inferences from the evidence. Qualified experts may express opinions on issues beyond common understanding (Evid. Code, §§ 702, 801, 805), but lay views on veracity do not meet the standards for admission of expert testimony. A lay witness is occasionally permitted to express an ultimate opinion based on his perception, but only where 'helpful to a clear understanding of his testimony' [citations], i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed. [Citations.]" (*People* v. *Melton, supra,* 44 Cal.3d at p. 744.)

▇ Although Deputy Rifkin's opinion of Weary's veracity may have been rationally based on his perceptions of the victim's physical condition and mental state, it was not necessary to elucidate his testimony. On the contrary, it also tended to invade the province of the jury on this issue. "[T]he credibility or degree of weight which shall be given to a dying declaration is solely a question for the jury, that they may apply the same tests and principles in determining its truth that they apply in the consideration of the evidence of the witnesses . . . ." (*People* v. *Thomson, supra,* 145 Cal. at p. 723; see also *People* v. *Dallen, supra,* 21 Cal.App. at pp. 780-781.) Accordingly, the court should have sustained the defense objection to this evidence.

Nevertheless, the error did not alter the outcome of the trial and, thus, does not warrant reversal. (Cal. Const., art. VI, § 13; Evid. Code, § 353.) Rifkin properly testified to his observations and perceptions as a percipient witness to Weary's parting words. Given the length and nature of their acquaintance, he may also have been qualified to render an opinion as to the victim's character for honesty and veracity. (See Evid. Code, §§ 780, subd. (e), 786; *People* v. *Sergill* (1982) 138 Cal.App.3d 34, 39 [187 Cal.Rptr. 497].) Hence, Rifkin's opinion as to his credibility on a specific occasion added little to the evidence the jury was already entitled to hear; and other independent facts strongly linked defendant to the killing. He and the victim had had prior hostile contact the evening before when defendant was driving a similar black Blazer. He gave conflicting statements regarding this incident, initially denying he had ever seen the victim even though police had found his fingerprints on the victim's automobile. Moreover, defendant

presented little, if any, evidence tending to undermine the credibility of the dying declaration. Given this totality of circumstances, the court's failure to exclude Rifkin's opinion testimony could not have prejudiced the outcome.

III. *Hearsay Identification of a Different Assailant*

█ During cross-examination of Deputy Aguilar, defense counsel elicited testimony that Gregory Haney, the front seat passenger in the victim's car at the time of the shooting, had identified Mark Cofield as the perpetrator in a photographic lineup. The prosecutor objected to the evidence as hearsay, and the trial court granted a motion to strike. The record does not reveal the reason Haney was not called to the stand.

We find no error. "(a) 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. [¶] (b) Except as provided by law, hearsay evidence is inadmissible. . . ." (Evid. Code, § 1200.) Defendant cites no exception authorizing admission of the excluded identification. Instead, he argues that due process required the court to leave the testimony standing as evidence of a third party's culpability for the crime charged. (*Chambers* v. *Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038].) However, our facts differ markedly from those in *Chambers* and do not mandate a similar resolution. In that case, the trial court excluded evidence of a third party's repeated extrajudicial confession because the Mississippi hearsay rule did not provide an exception for statements against penal interest. (*Id.,* at pp. 289-290 [35 L.Ed.2d at pp. 305-306].) In light of its significance and the substantial indicia of trustworthiness implicit in such a declaration, the Supreme Court found the exclusion of this evidence denied the defendant a fair trial. (*Id.,* at pp. 300-302 [35 L.Ed.2d at pp. 311-313].)

Here, aside from Haney's out-of-court identification, defendant proffered virtually no evidence of a specific third party's culpability but instead simply denied his own responsibility for the crime. (See generally *People* v. *Hall* (1986) 41 Cal.3d 826, 833 [226 Cal.Rptr. 112, 718 P.2d 99]; *In re Miguel L.* (1982) 32 Cal.3d 100, 107-108 [185 Cal.Rptr. 120, 649 P.2d 703].) More importantly, the record contains no indicia of reliability for Haney's statement, which the prosecution had no opportunity to test on cross-examination. (*In re Miguel L., supra,* at pp. 107-109; see also *People* v. *Mayfield* (1972) 23 Cal.App.3d 236, 242-244 [100 Cal.Rptr. 104].) The ruling also did not preclude defendant from presenting his more substantial defense of alibi, which rested on entirely different testimony. Consequently, we find no denial of due process or fair trial.

## IV. *Sufficiency of Evidence of Deliberation and Premeditation*

■ Lastly, defendant challenges the sufficiency of the evidence that he deliberated and premeditated the murder of Miles Weary. In *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], the California Supreme Court articulated the following observations on this question: ■ "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id.,* at pp. 26-27.)

■ The fully armed killer in this cold-blooded street gang murder tracked the victim to the location of the assault and without warning opened fire into his vehicle. The jury was properly instructed on the elements of both first and second degree murder and the requirement of determining every element beyond a reasonable doubt. It is disingenuous to claim that evidence of all the three types enumerated in *Anderson* was too insubstantial as a matter of law to support their conclusions. (See, e.g., *People* v. *Miranda* (1987) 44 Cal.3d 57, 86-87 [241 Cal.Rptr. 594, 744 P.2d 1127], cert. den. 486 U.S. 1038 [100 L.Ed.2d 613, 108 S.Ct. 2026], reh. den. 487 U.S. 1246 [101 L.Ed.2d 956, 109 S.Ct. 4]; *People* v. *Wells* (1988) 199 Cal.App.3d 535, 539-541 [245 Cal.Rptr. 90].) Essentially, defendant asks this court to reweigh the facts and resolve them more favorably than the 12 persons charged with that responsibility under our criminal justice system. In so doing, he misconceives our function and jurisdiction: ■ "In reviewing the sufficiency of the evidence, we must draw all inferences in support of the verdict that can reasonably be deduced and must uphold the judgment if, after viewing all the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. [Citation.]" (*People* v. *Miranda, supra,* 44 Cal.3d at p. 86.) That standard has been fully met in this case.

### DISPOSITION

The judgment of conviction is affirmed.

Klein, P. J., and Croskey, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 25, 1990.