Filed 7/3/14  P. v. Hicks CA5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F065268 |
| Plaintiff and Respondent, | (Super. Ct. No. F08907065) |
| v. | |
| JAMES EDWARD HICKS, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Gary R. Orozco, Judge.

Eric Weaver, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Charity S. Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## *INTRODUCTION*

After his first trial ended in a hung jury, defendant James Edward Hicks was retried and convicted of the following: two counts of shooting from a motor vehicle (Pen. Code,[1] § 12034, subd. (c), counts 1 & 2); one count of shooting at an inhabited dwelling (§ 246, count 3); one count of unlawful firearm activity (§ 12021, subd. (e), count 4); and one count of active participation in a criminal street gang (§ 186.22, subd. (a); count 5). With respect to counts 1 through 3, the jury found true allegations the crimes were committed for the benefit of, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)) and that defendant personally and intentionally discharged a firearm which proximately caused great bodily injury to the two victims (§ 12022.53, subd. (d)). Defendant was sentenced to prison for an aggregate term of 110 years to life.

On appeal, defendant contends, inter alia, that the trial court erred when it permitted a police detective to offer his personal opinion regarding the credibility of the prosecution's chief witness, an accomplice who identified defendant as the shooter in the subject drive-by shooting. We agree and reverse. As we shall explain, the evidence of guilt was not overwhelming. The only witness who corroborated the accomplice's identification of defendant originally identified someone else as the shooter. The only physical evidence arguably tying defendant to the crimes—a receipt for ammunition like the kind used in the shooting—was found in the presence of both defendant and the person initially identified as the shooter. The accomplice's credibility was a critical issue in this case and the jury here may very well have relied on the detective's positive assessment of the accomplice's veracity to resolve that issue against defendant. Because it is reasonably probable that a result more favorable to defendant would have been

---

[1] Further statutory references are to the Penal Code unless otherwise specified.

reached had the improper opinion testimony not been admitted, the erroneous admission of this evidence requires reversal of the judgment.[2]

## FACTS

### I.    Summary of Prosecution Evidence[3]

#### A.    The Shooting and Initial Identification of Benjamin Leffell as the Shooter

On October 19, 2008, around 5:00 p.m., high school students Dashawn Roland and Dante Smith were struck by multiple gunshots while standing outside an apartment complex located on Jensen Avenue in Fresno.  At trial, the parties stipulated that both Roland and Smith suffered great bodily injury as a result of the shooting.

Fresno Police Officer Stacie Szatmari was first to arrive at the scene around 5:02 p.m.  Officer Szatmari observed Roland was lying down and bleeding profusely, and his stepmother, Jacqueline Headley, was applying pressure to his neck, chest, and shoulder areas.  Headley seemed "very frantic" and "slightly under the influence."  Officer Szatmari detected a strong scent of alcohol on Headley's breath.

After taking brief statements from the victims, Officer Szatmari took a number of statements from other witnesses in the area, including Headley.  According to Headley's statement, the gunshots came from a light green "Dodge Stratus-type vehicle, possibly in the late 90's."  There were four African-American males inside the car.  The front seat passenger was the shooter.  The shooter wore a red baseball cap with the letter "P" on it.[4]

---

[2]    In light of the reversal, we do not address defendant's claim the trial court erred in denying his petition for disclosure of juror identifying information.

[3]    Because we have found error requiring a prejudice analysis, our summary of the prosecution's evidence incorporates relevant, undisputed facts elicited by defense counsel during the presentation of the prosecution's case.

[4]    Officer Szatmari's testimony regarding Headley's initial description of the shooter was elicited by defense counsel after the trial court, in the interests of time, permitted counsel to ask additional questions beyond the scope of direct examination.

3

On October 20, 2008, Detective Andre Benson took a statement from Headley at the hospital where the victims were being treated. Headley provided a description of the shooter and suspect vehicle. Specifically, "She advised it was a light-complected Black male positioned in the front right passenger seat of a light green, either Dodge Stratus or Ford Taurus." At the preliminary hearing, Headley acknowledged that defendant was not a light-complected African-American male.

On October 21, 2008, Detective Benson took a photographic lineup to the hospital to show Headley; the lineup did not include a photograph of defendant. Before viewing the lineup, Headley told the detective she heard someone named "Sav" was possibly responsible for the shooting. Detective Benson testified that "Sav" was short for "Savage" and that Savage was a moniker or nickname for Benjamin Leffell. Leffell was depicted in the No. 2 position of the lineup.

After Detective Benson showed Headley the lineup, she pointed to No. 2 and said he appeared to be the person she observed firing the weapon. She also mentioned that Nos. 1 and 2 looked similar but ultimately signed her name with No. 2. Headley asked Detective Benson if No. 2 was Savage. The detective replied he could not tell her whether it was or not.

On October 30, 2008, Detective Benson served a search warrant at an apartment located on East Alamos (the Alamos apartment). Leffell was present in the apartment and taken into police custody. Defendant and a female were also present. In the living room, the police found a blue backpack. The backpack contained a receipt for the purchase of the same type of nine-millimeter ammunition used in the shooting. Detective Benson confirmed the police were never able to determine who the backpack belonged to, and noted that no one in the apartment claimed ownership.

On cross-examination, Detective Benson acknowledged that Leffell claimed ownership of a pair of jeans found lying next to the backpack containing the ammunition

4

receipt. In the course of his investigation, Detective Benson learned the Alamos apartment was a place where people went to make music and hang out.

## II.  *Subsequent Identifications of Defendant as the Shooter*

A few days before November 6, 2008, Detective Benson received an anonymous phone call from a female informing him that a person she knew as "Natural" was the driver of the car involved in the shooting. Detective Benson determined that Natural was Eric Carolina, who became the prosecution's chief witness.

Detective Benson testified he interviewed Carolina at the police station on November 6, 2008. During the interview, Carolina admitted he was the driver of the car involved in the shooting and identified defendant as the shooter. At the time of the interview, Carolina only knew defendant by his gang moniker "Jesse James." However, Carolina claimed he did not know defendant was a gang member at the time of the shooting.

Before a video-recording of Detective Benson's interview with Carolina was played for the jury, Detective Benson testified that, at the time of the interview, Leffell was still in custody for the shooting. Detective Benson testified his "demeanor" towards Carolina during the interview was "pretty aggressive," explaining that "up until this point I had been led to believe that Benjamin Leffell was the suspect responsible for the shooting, and now I had Eric Carolina telling me something different, so I wanted to insure that the information he was providing was accurate and truthful."

After the video of the interview was played to the jury, Detective Benson testified that, at first he did not believe what Carolina was telling him regarding the identity of the real shooter. But Detective Benson came to change his opinion through the course of the interview. When asked why, Detective Benson explained it was a "pretty tough interview, as you just witnessed" and "[Carolina] took pretty much everything that I had and he never wavered in regards to who the driver was, who the shooter was, and who the

5

rear passenger was." Next Detective Benson was asked if he had "ever gone at somebody that hard in an interview and not—not broke them of their story?" Detective Benson responded, "Absolutely not."[5]

Based on his involvement in the incident, Carolina pled guilty to assault with a semiautomatic firearm, shooting from a motor vehicle, and shooting at an inhabited building and admitted gang and arming enhancements, in exchange of a stipulated term of 23 years eight months. At the time he made his statement to Detective Benson, Carolina was not charged with a crime and was not trying to get a plea deal. Carolina did not talk to the district attorney until April 2010, and he entered the plea agreement on August 19, 2010. It was Carolina's understanding that if he lied on the stand, the plea would be taken from him and he would be prosecuted on the original charges.

Carolina testified he was familiar with Leffell, but he was closer to defendant. At the time of his police statement, Carolina was aware that Leffell was in custody for the shooting and it was going through his mind that he did not want the wrong person to get in trouble for the crime. Since it had become known that Carolina was cooperating with the police and district attorney's office, Carolina had been threatened in jail and placed in protective custody.

Carolina's trial testimony regarding the shooting was largely consistent with the version of events he provided to Detective Benson. According to Carolina's testimony, on the afternoon of October 19, 2008, he attended a benefit carwash to raise funeral expenses for someone who had died. The carwash was located on Jensen and Elm in Fresno. When Carolina arrived at the carwash, there were around 25 to 30 people washing cars. Carolina, who admitted to being an associate of the "Dog Pound" gang,

---

**5** The detective's testimony regarding his interview of Carolina is set forth in greater detail below in the Discussion section of the opinion.

6

explained that members of both the Dog Pound and "Modoc Boys" gangs were present at the carwash, and that members of both gangs got along with one another.

Carolina stayed at the carwash 30 to 45 minutes, before he left in his car—a light "grayish-green" Dodge Stratus—with defendant and Patrick Madden. Carolina was driving the car, defendant was sitting in the front passenger seat, and Madden was sitting in the back passenger seat behind defendant.

At defendant's request, Carolina drove to the Alamos apartment where defendant picked up some clothes. From the Alamos apartment, they went to Carolina's apartment where he picked up some towels to take back to the carwash. After briefly stopping at a residence where no one was home, defendant instructed Carolina on how to get back to the carwash.

As they were driving eastbound on Jensen and started to pass Walnut, defendant said, "There go them niggas right there." Carolina asked defendant who he was talking about. Defendant responded, "Man, them niggas." Carolina asked defendant if he was talking about "Ma-dummies," which is a disrespectful name for rival gang members known as "Muhammads."

When they reached the next big street, defendant asked Carolina to make a U-turn and return to the area they had just passed on Walnut. Defendant asked Carolina to slow down as they passed the area. As Carolina was slowing down, defendant pulled a nine-millimeter gun out from under his shirt and fired it seven to eight times out of the front passenger window.

After defendant fired the gun, Carolina was "shocked" and defendant told him, "drive." Defendant then said, "I think I hit somebody." Carolina asked defendant, "What was all that about?" Defendant replied, "I was trying to wake them niggas' game up." Carolina explained that "wake someone's game up," meant catching a rival gang member "off their guard" and "like wake them up so that they can be alert."

7

After dropping off defendant, Carolina returned to the carwash and told his brother about the shooting. Later that night, defendant called Carolina and said, "Don't say anything, don't talk to nobody about what happened."

At some point, Carolina went to Dog Pound gang territory where defendant and a group of people, including Madden and Carolina's brother, Ernest Carter, were discussing the shooting and who was involved. Defendant told them he shot out of the car and "hit somebody he wasn't supposed to hit."

Carolina testified that everything in his November 6, 2008, statement to Detective Benson was truthful except for his statement that defendant was wearing a hat with a "P" on it at the time of the shooting. Carolina pointed out that, during the interview, he repeatedly told Detective Benson, and even swore to God, that defendant was not wearing a hat with a "P" on it. However, Carolina testified he ultimately felt pressured by the detective to change his statement. Carolina explained that "after being pressured and me not seeing the significance in it, I just said, 'okay, yeah, he had a "P" hat on,' because I was being accused of lying to him, so just to move on and go forward, I told him, yeah, all right, he had a 'P' hat on."

Headley also testified at trial and identified defendant in court as the shooter. Headley testified she recalled seeing three men inside the car and defendant was sitting in the front passenger seat. Headley also testified that defendant was not wearing a red hat with a letter "P" on it as she had described the shooter in her initial statement to Officer Szatmari.

Headley explained that at the time of her original description of the shooter, she mistakenly confused him with someone she had seen no more than 10 minutes before the shooting. Headley testified: "[M]y mind went back to the person that I seen, and the person I seen before the shooting was Sallaam, and that's the person that had the hat on

8

that walked by the apartments." On cross-examination, Headley confirmed that the current trial was the first time she had ever mentioned a person named Sallaam.

Headley identified defendant as the shooter from a second photographic lineup Detective Benson showed her about three weeks after the shooting. Headley testified that when she mistakenly identified Leffell in the first lineup, "I couldn't really remember nothing" and "I should have just waited until I got my thoughts together."

Headley suggested she initially identified Leffell because she had heard from other people he was responsible for the shooting. On cross-examination, however, Headley admitted she had never met Leffell and had no idea what he looked like at the time she picked his photograph in the first lineup.

On cross-examination, Detective Benson testified that Headley said, "That's him" and "That looks exactly like him" when she picked Leffell's picture in the first photographic lineup. When Detective Benson showed her the second lineup, where defendant was depicted in the No. 4 position, Headley pointed to No. 4 and said, "that kinda looks like the subject right there."

### III.    *Gang Evidence*

Fresno Police Detective Ron Flowers testified as an expert regarding criminal street gangs. In Detective Flower's opinion, defendant was a member of the Modoc Boys gang and Carolina and Madden were both members of the Dog Pound gang. The October 19, 2008, shooting occurred in territory of the rival "Muhammad Family" gang.

Presented with a hypothetical based on the circumstances of the shooting, Detective Flowers opined that the crimes benefited the Modoc Boys gang by sending a powerful message about the strength of the allegiance between the Modoc Boys and Dog Pound gangs, both of whom had reputations for being extremely violent. The detective's opinion was not altered by the circumstance that the people who were shot were not gang members. Detective Flowers further opined that the crimes were committed in

9

association with the Dog Pound gang because at the time of the shooting by a Modoc Boys gang member, he was in the presence of two Dog Pound members.

## IV.    *Summary of Defense Evidence*

The parties stipulated that in defendant's first trial in March 2011, Headley testified that she remembered telling the first officer who arrived at the scene that the shooter was a "light-skinned Black male."

Defense investigator Margarita Reyes testified that when she interviewed Headley on January 5, 2012, Headley expressed that she was frustrated and wanted defendant convicted. Headley commented that the first trial was "a waste of her time" and because the driver of the suspect car identified defendant it "should have been just a closed book, just based on what he said."

Headley also told Reyes that she felt that the shooting victim Dashawn Roland would not tell the truth because he was "Dog Pound now, and the Dog Pound and Modoc are like this," crossing her fingers. Headley also claimed defendant's parents, Patricia and James Hicks, Sr., offered Roland a car not to testify against defendant.

Charles Lewis was housed in the same jail pod as defendant sometime after Christmas 2010. During that time, Carolina handed Lewis a letter to give to defendant. The letter was friendly in tone.

Dashawn Roland testified he did not know defendant prior to the shooting on October 19, 2008. The first time he met defendant was when he testified in court in early 2009. Roland denied that he had ever been offered a vehicle by someone named Patricia or James Hicks in exchange for not testifying against defendant. Roland had never met defendant's parents nor received anything from them.

During the shooting, Roland did not see the shooter's face. But before he was shot, he saw a gun hanging out of a car. The arm holding the gun was the arm of a light-skinned person and the person was lighter than defendant. On cross-examination, Roland

10

acknowledged that he answered no, when asked at the preliminary hearing if he saw anyone displaying a weapon in any fashion right before the shooting.

At a party in August 2011, Roland got involved in a confrontation with a light-skinned man who told Roland he should have killed him. Roland understood the man to be referring to the October 19, 2008, shooting because that was the only time Roland's life had ever been under attack. Roland asked the man if he shot him. After the man answered, "yeah," Roland hit him and they started fighting.

Defendant testified on his own behalf and denied that he rode in Carolina's car or was involved in the shooting on October 19, 2008. Defendant made a few songs with Carolina but otherwise he did not know him well. He knew Carolina through Carolina's brother, Ernest Carter, who was a Dog Pound gang member.

According to defendant's testimony, he went to the benefit carwash on Jensen and Elm, which was held for a close friend and gang member who had been killed. Defendant arrived at the carwash around 2:00 p.m. Towards the end of the day, defendant heard gunshots and saw an ambulance traveling towards Jensen. The people at the carwash started packing up all the towels and cleaning equipment and left to walk to the Dog Pound area, where they stayed and partied until 11:00 p.m. or 12:00 a.m.

Defendant was a member of the Modoc Boys gang. He became a member when he was 11 years old. Defendant explained he joined the gang because everybody was affiliated with a gang where he lived and most of the friends with whom he grew up were gang members. Defendant's older brothers were also in the gang. Defendant grew up without a father because his father was incarcerated.

Defendant also identified as a "Six Deuce Diamond Crip." As a Crip, he wore blue clothing. He did not wear a red baseball cap. If he wore red, he would risk getting beaten up or labeled a "Pepsi."

11

Defendant denied he had ever been involved in any of the offenses committed by other gang members described in Detective Flower's expert gang testimony. He had not been involved in shooting at people, robbery, carjacking, assault, or pimping. Defendant was still in the gang because he did not believe he had a choice in jail, but he wanted to get out of the gang because of all the distress it had caused his family.

On cross-examination, defendant confirmed that in 2003, he suffered a juvenile adjudication for possession of a stolen car, and in 2007, he suffered a juvenile adjudication for illegal possession of a loaded gun.

Defendant acknowledged that when his "close friend" Benjamin Leffell was initially arrested for the shooting, defendant "put money on his books" for Leffell to buy things from the jail commissary. Defendant denied that the true reason he put money on Leffell's books was because he knew Leffell did not do the shooting.

Defendant also acknowledged that, on the night of the shooting, Roland's father, "Snapper," called Carter, and Carter passed the phone to defendant. Defendant denied that he apologized for the shooting when he spoke to Snapper. Rather, defendant told Snapper he was sorry his son was shot. When he spoke to Snapper, defendant had information about the shooting because information was being passed around the whole neighborhood. Defendant did not give that information to Snapper, however, because defendant was "not a snitch" and "there's consequences for that."

## *DISCUSSION*

Defendant contends the trial court erred when it permitted Detective Andre Benson to offer his personal opinion that Eric Carolina was telling the truth during his police interview and should have struck the entirety of Benson's opinion testimony rather than just one statement from that testimony. This contention has merit.

12

### A.     *Additional Factual and Procedural Background*

During direct examination, the prosecutor questioned Detective Benson, in relevant part, as follows:

"Q.  Okay.  Is it fair to say that at the beginning of the interview, at least, that you didn't necessarily believe what Eric Carolina was saying about who the shooter was?

"A.  I did not believe what he was telling me in regards to who the actual shooter was.

"Q.  And did you later, through the course of the interview, come to change your opinion?

"A.  I did.

"Q.  And why is that?

"[DEFENSE COUNSEL]: Objection.  Ultimate issue—relevance.

"THE COURT:  Let me hear the answer.

"Go ahead, you can answer.

"THE WITNESS:  Well, this was a pretty tough interview, as you just witnessed.  He took pretty much everything that I had and he never wavered in regards to who the driver was, who the shooter was, and who the rear passenger was.  So over the course of the interview, when I walked out of the interview, *I was convinced that he was telling the truth.*

"[DEFENSE COUNSEL]:  Same objection.

"THE COURT:  Okay.  That is just the reason as to why he changed his opinion.  Just —*I'll strike the last portion, 'I believed he was telling the truth.'  Jury is admonished not to consider it.*

"[THE PROSECUTOR]:  Q.  And have you conducted a lot of interviews in your career as a detective?

"A.  Yes.

"Q.  Okay.  And have you ever gone at somebody that hard in an interview and not—not broke them of their story?

13

"A.  Absolutely not."  (Italics added.)

### B.    *Applicable Legal Authorities*

Admission of opinion testimony is limited by statute.  A lay witness may testify in the form of an opinion that is rationally based on the perception of the witness and will be helpful to a clear understanding of his or her testimony.  (Evid. Code, § 800.)  An expert, on the other hand, may testify in the form of an opinion if the subject of his opinion "is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact," and the opinion is "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness …."  (*Id.,* § 801, subds. (a), (b).)

"Our state Supreme Court has recognized that a lay witness's opinion about the veracity of another person's particular statements is *inadmissible* and *irrelevant* on the issue of the statements' credibility.  (*People v. Melton* (1988) 44 Cal.3d 713, 744.)  The high court reasoned that such lay opinion testimony invades the province of the jury as the ultimate fact finder, is generally not helpful to a clear understanding of the lay witness's testimony, is not 'properly founded character or reputation evidence,' and does not bear on 'any of the other matters listed by statute as most commonly affecting credibility' in Evidence Code section 780, subdivisions (a) through (k).  (*People v. Melton*, *supra*, at p. 744.)"  (*People v. Zambrano* (2004) 124 Cal.App.4th 228, 239-240, italics in original.)

*People v. Sergill* (1982) 138 Cal.App.3d 34 (*Sergill*), a case cited by defendant, is instructive.  In *Sergill*, the defendant was charged with committing a sexual offense against his eight-year-old niece.  The prosecutor asked one of the investigating officers whether he had formed an opinion as to whether the child was telling the truth, and what was that opinion.  (*Id.* at p. 38.)  The officer testified that in his opinion, the girl was truthful, and explained that as a result of his dealings with many children he could usually

14

determine with a high degree of accuracy whether their statements were true. The trial court overruled the defense's objection to this testimony saying, "'this officer has had approximately seven years of experience, and has written ... a thousand or more reports, ... and I think [in] the course of that he would be normally expected to judge whether a person, in his opinion, is telling the truth or not.'" (*Ibid.*) Additionally, the court allowed another police officer, who had also interviewed the girl, to express an opinion that she was telling the truth when she reported that her uncle had molested her. (*Ibid.*)

The appellate court held that the veracity of those who report crimes to the police is not a proper subject of expert testimony; and, even if it were, the fact that the officers had taken numerous reports during their careers would not qualify them as experts in judging truthfulness. (*Sergill*, *supra*, 138 Cal.App.3d at p. 39.) The court further held that the testimony was not admissible as lay witness opinion testimony, explaining: "Both these officers were able to describe their interviews with the girl in concrete detail and their opinions or conclusions as to her truthfulness were not 'helpful to a clear understanding of [their] testimony.' (Evid. Code, § 800, subd. (b).)" (*Sergill*, *supra*, at p. 40.) The court continued,

> "This opinion testimony did not fall within any of the categories listed in Evidence Code section 780, which enumerates the most common factors bearing on the question of credibility. [Citations.] As we have stated, these officers neither knew the child, nor knew her reputation for truthfulness. [Citation.] Instead, their conclusions that she was telling the truth were based on their own self-proclaimed expertise in assessing victim veracity, but the record is devoid of any evidence to establish their qualifications in this regard. We conclude that the officers' opinions on the child's truthfulness during their limited contacts with her did not have a *reasonable* tendency to prove or disprove her credibility and were therefore not relevant." (*Sergill*, *supra*, 138 Cal.App.3d at p. 40; see also *People v. Smith* (1989) 214 Cal.App.3d 904, 915 [trial court erred in admitting a police officer's testimony that he believed the victim's dying declaration identifying defendant].)

15

### C.    Analysis

The parties agree the trial court properly struck and admonished the jury not to consider Detective Benson's testimony that he was "convinced" Carolina was "telling the truth." The issue is whether the remaining portion of Detective Benson's testimony also constituted improper opinion testimony. We conclude that it did. It is apparent from the record that the prosecutor's entire line of questioning was seeking Detective Benson's opinion on Carolina's veracity and not simply his observations of Carolina's demeanor during the interview, as the People suggest. The prosecutor began by asking whether it was fair to say that Detective Benson did not necessarily believe Carolina was telling the truth at the beginning of the interview, which elicited testimony that the detective did not believe what Carolina was telling him regarding the identity of the actual shooter. The prosecutor next asked *whether the detective came to change his opinion* during the course of the interview, which elicited the response that he did change his opinion. Because the detective's original opinion was that Carolina was *not* telling the truth regarding the identity of the shooter, the clear import of the detective's response was that now his opinion was that Carolina *was* telling the truth. At this point, defense counsel raised a valid objection because the detective's personal opinion regarding Carolina's veracity was irrelevant and drew a conclusion on an issue reserved for the jury.

However, instead of ruling on the objection, the trial court permitted Detective Benson to explain *why* he changed his opinion regarding Carolina's veracity, thereby allowing the detective to continue to expound on the improper subject. Although the trial court struck and admonished the jury not to consider the detective's most direct statement opining on Carolina's credibility, the prosecutor followed up with yet another question related to the improper subject of Carolina's veracity during the interview by asking the detective whether he had "ever gone at somebody that hard in an interview and not—not broke them of their story," which elicited a confident, "Absolutely not."

16

Even without the stricken statement, the overall thrust of Detective Benson's testimony was that he believed Carolina was telling the truth because he was unable to break Carolina's story with aggressive interview tactics he was experienced in employing to break witnesses' stories. The detective indicated he had *never* failed to break a false story in an interview like the one he conducted of Carolina. This testimony bolstered his previous, unstricken testimony that he changed his initial opinion of Carolina (i.e., "I did not believe what he was telling me in regards to who the actual shooter was") because Carolina "never wavered in regards to who the driver was, who the shooter was, and who the rear passenger was." Detective Benson suggested that his experience conducting aggressive witness interviews uniquely qualified him to determine whether a witness was being truthful. But, as *Sergill* teaches, simply being a police detective and conducting numerous investigations or interviews does not qualify one as an expert in divining the truth. (*Sergill*, *supra*, 138 Cal.App.3d at p. 39.)

Consequently, we conclude the trial court erred in admitting the entirety of Detective Benson's testimony regarding Carolina's veracity. Having concluded the trial court erred in admitting this testimony, "[w]e must examine the entire cause, including the evidence, and determine whether it is reasonably probable that a result more favorable to [defendant] would have been reached had this evidence not been admitted. (*People v. Watson* (1956) 46 Cal.2d 818, 836; Evid. Code, § 353.)" (*Sergill*, *supra*, 138 Cal.App.3d at p. 41.) Under the unique circumstances of this case, we are unable to conclude that the error did not prejudice defendant.

As in *Sergill*, defendant's first trial ended in a mistrial when the jury was unable to agree on a verdict. (*Sergill*, *supra*, 138 Cal.App.3d at p. 41.) Nor was the evidence against defendant overwhelming. As the prosecutor acknowledged in closing argument, the only evidence tying defendant to the shooting was provided by the testimony of Carolina and Headley, and defendant's presence in the Alamos apartment where police

17

found the backpack containing a receipt for ammunition like the kind used in the shooting. However, this evidence was not without problems. As the jury was properly instructed, Carolina was an accomplice to the crimes and therefore his testimony required corroboration. Although Headley corroborated Carolina's identification of defendant as the shooter, she originally described and identified someone else as the shooter, and her explanations for why she originally identified the wrong person raised their own credibility issues. As for the ammunition receipt, both defendant and Benjamin Leffell, the person Headley originally identified as the shooter, were present when the backpack with the ammunition receipt was discovered in the Alamos apartment. While ownership of the backpack was never determined, Leffell did claim ownership of a pair of jeans found lying next to the backpack, arguably tying him more closely to the evidence than defendant.

Headley's inconsistent identifications of the shooter and the equivocal nature of the ammunition receipt evidence may very well have led the jury to place undue emphasis on Detective Benson's opinion testimony regarding Carolina's credibility and to look to his testimony as corroborating Carolina's testimony identifying defendant as the shooter. The trial court did not strike or admonish the jury not to consider the main portion of Detective Benson's testimony on the subject, which essentially told the jury he changed his initial opinion that Carolina was not telling the truth regarding the identity of the shooter because Carolina never wavered in his identification despite the detective's experienced use of aggressive interview tactics. Carolina's credibility was undeniably a "critical question" in this case. (*Sergill*, *supra*, 138 Cal.App.4th at p. 41.) In a case which largely turned on whether the jury credited Carolina's account of the shooting, we believe it is reasonably probable that a result more favorable to defendant would have been reached had Detective Benson's opinion testimony regarding Carolina's credibility not been admitted.

18

## *DISPOSITION*

The judgment is reversed.

                                   _____

                                          HILL, P. J.

WE CONCUR:

_____

LEVY, J.

_____

DETJEN, J.

19